In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3305

JASON HALASA,

*Plaintiff-Appellant*,

*v.*

ITT EDUCATIONAL SERVICES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:10-cv-00437-WTL-MJD—**William T. Lawrence**, *Judge.*

ARGUED JUNE 6, 2012—DECIDED AUGUST 14, 2012

Before EASTERBROOK, *Chief Judge,* and WOOD and SYKES,
*Circuit Judges.*

WOOD, *Circuit Judge.* ITT Educational Services is a
for-profit corporation that runs "ITT Technical Institutes"
in several locations throughout the United States,
including Lathrop, California. Plaintiff Jason Halasa was
the Lathrop Campus's College Director for six months in
2009. The parties provide competing accounts of the
end Halasa's tenure: ITT says that Halasa was fired for

exhibiting poor management skills and delivering inadequate results; Halasa alleges that he was fired in violation of the False Claims Act, 31 U.S.C. § 3730(h), after identifying and reporting several irregularities in the way ITT was handling its federally subsidized loans and grants for students. We conclude that even if Halasa did engage in protected conduct under the Act, he has not shown that he was fired because of this conduct. Thus, we affirm the decisions of the district court granting summary judgment and costs in ITT's favor.

# I

ITT is a for-profit corporation that operates Technical Institutes throughout the country. Like many such for-profit institutions, nearly three-quarters of its total cash receipts come from the federal treasury by way of student loans and grants. See S. Comm. On Health, Educ., Labor and Pensions, *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*, S. PRT. NO. 112-37, at 30 (July 30, 2012). Students enroll in ITT's Institutes, and they often pay for those programs with federally-funded student aid. In order to qualify to receive this aid on behalf of its students, ITT must comply with certain regulatory requirements, some of which are incorporated into a Program Participation Agreement (PPA) between ITT and the U.S. Department of Education.

Drawing all inferences in Halasa's favor, as we must at this stage of the litigation, *Chicago Reg'l Council of Carpenters v. Village of Schaumburg*, 644 F.3d 353, 356 (7th Cir.

2011), we summarize the events underlying this case. On March 9, 2009, Halasa began employment at ITT's Lathrop Campus as its College Director. According to Halasa, the campus was in disarray when he arrived. It was undergoing a large remodeling project, and several important leadership positions were vacant. Halasa contends that this had created a vacuum of leadership. In the absence of proper oversight, he said, some Lathrop employees had begun engaging in a variety of unlawful recruiting and reporting practices. Student recruiters (that is, employees responsible for persuading prospective students to enroll in Institute programs) were paid on an incentive basis—a scheme that is expressly prohibited by the PPA. See 20 U.S.C. § 1094(a)(20) (prohibiting "commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments"). Other ITT employees were allegedly pressured to change the entrance exam scores of prospective students, to alter the grades of students to improve their job prospects, and to misreport the employment statistics of graduates. Halasa reported all these observations to his direct supervisor, Jeff Ortega. He also reported some of them to Valory Hemphill, ITT's Regional Director of Recruitment, and Chris Carpentier, its Director of Compliance.

Meanwhile, ITT was experiencing some problems of its own with Halasa. ITT received several complaints about Halasa's behavior via its Ethics Alert Line. According to these complaints, Halasa smoked a hookah pipe with other ITT employees in the campus parking

lot during a student orientation event. He also allegedly referred to himself as the "King" and his colleagues as the "Mafia." (We have highlighted only a few such incidents here. There are others. For example, Halasa allegedly hatched an ill-advised plan to close all of the restrooms on the Lathrop Campus simultaneously. When employees needed to use those facilities, he proposed that they to go to a nearby Arby's fast-food restaurant.) Beyond these incidents, the Lathrop campus was performing below expectations. During an operational review conducted in May 2009, ITT Executive Vice President Gene Feichtner was unimpressed with the campus's development under Halasa's management. A few months later, in August 2009, the campus received a low score in an internal audit, prompting ITT CEO Kevin Modany to send an email to Halasa indicating his "disappoint[ment]" with the campus's progress.

Finally, on September 9, 2009, several vice presidents and the CEO decided to terminate Halasa's employment. The parties disagree about what prompted this. ITT asserts that it fired Halasa because it had lost "confidence in his ability to lead the college." Halasa contends that ITT ended their relationship because he had identified and reported violations of ITT's legal obligations under the PPA. Believing that this type of retaliation violates the False Claims Act, Halasa filed suit in the U.S. District Court for the Southern District of Indiana, where ITT is headquartered. The district court granted summary judgment in favor of ITT. Halasa now appeals.

**II**

We review the district court's grant of summary judgment *de novo*. *Village of Schaumburg*, 644 F.3d at 356. In opposing ITT's summary judgment motion on his claim for unlawful retaliatory discharge under the Act, Halasa needed to point to evidence showing first that he engaged in protected conduct and then that he was fired "because of" that conduct. 31 U.S.C. § 3730(h)(1); *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 944 (7th Cir. 2002).

Section 3730(h)(1) protects two categories of conduct. The statute has long prevented employers from terminating employment for conduct that is "in furtherance of an action under this section." In *Brandon*, we explained that this language reached conduct that put an employer "on notice of potential [False Claims Act] litigation." 277 F.3d at 945. In 2009, Congress amended the statute to protect employees from being fired for undertaking "other efforts to stop" violations of the Act, such as reporting suspected misconduct to internal supervisors. For the purposes of this appeal, we proceed on the assumption that Halasa's conduct falls within the scope of the statute's amended language. As we noted above, recruiters at the Lathrop Campus were allegedly compensated on the basis of their recruitment success in violation of 20 U.S.C. § 1094(a)(20), a requirement that was specifically incorporated into ITT's PPA. See *id.* at § 1094(a). Furthermore, some prospective students were allegedly receiving inappropriate assistance on placement exams (so-called "ability to benefit" exams)

or had their scores altered *post hoc* so that they could qualify to receive financial aid. See *id.* at § 1091(d)(1). Halasa investigated these claims and reported his findings to Ortega, Hemphill, and Carpentier, presumably to ensure that ITT ended these practices and to prevent ITT from making any false certifications to the U.S. Department of Education in connection with its PPA. We are satisfied that Halasa's evidence would permit a trier of fact to find that he engaged in "efforts to stop" potential FCA violations.

Even assuming that his conduct was protected by the Act, however, Halasa faces a second hurdle. He must show that his protected conduct was connected to ITT's decision to fire him. Practically, in order to avoid summary judgment he must have evidence that would support a finding that he was fired "because of" his protected conduct. That is where his case founders. The record is undisputed that the decision to fire Halasa was made by Vice President Barry Simich and approved by Senior Vice President Nina Esbin, Executive Vice President Feichtner, and CEO Modany. Yet Halasa has no evidence that any of these decisionmakers knew of his protected conduct. Rather, the record shows that Halasa reported his findings only to Ortega, Hemphill, and Carpentier and there is no indication that any of these people passed along Halasa's findings to the decisionmakers. Halasa's best evidence is deposition testimony stating that all formal ethics complaints are required to be forwarded to Simich. But none of Halasa's False Claims Act-related reports was expressed

as a formal ethics complaint, and there is no evidence either that any of these reports ever reached a decisionmaker or that any of them otherwise learned of Halasa's protected activity.

Unable to prove causation as a factual matter, Halasa argues that we should find causation as a matter of law. He suggests that we impute to ITT (and its agents) any knowledge that Ortega gained when Halasa reported potential violations. This argument seriously misunderstands the way liability rules work in the corporate setting. The broad (and unprecedented) doctrine of constructive knowledge that Halasa urges would defeat the specific statutory requirement that an employee's termination be "because of" her protected conduct. The law is clear that it is the decisionmakers' knowledge that is crucial. Apart from narrow exceptions like the one that has come to be called the "cat's paw" theory, see *Staub v. Proctor Hospital,* 131 S. Ct. 1186 (2011), which does not apply here, companies are not liable under the False Claims Act for every scrap of information that someone in or outside the chain of responsibility might have.

Halasa has not shown that ITT fired him because of any protected conduct. The district court therefore properly granted summary judgment in ITT's favor, because Halasa failed to respond with evidence on one of the essential elements of his claim for retaliatory discharge in violation of the Act.

### III

Halasa also appeals from district court's decision requiring him to pay costs in the amount of $33,401.04 pursuant to 28 U.S.C. § 1920, and another $2,975.00 under Federal Rule of Civil Procedure 26(b)(4)(E)(i) for the deposition fees of an expert witness, Dr. Gerald Lynch. We first address our appellate jurisdiction over this part of the case, and then the merits of the two orders.

### A

As always, we must ensure that our jurisdiction is secure before addressing the merits of a question. See *Blue v. International Bhd. of Elec. Workers Local Union 159*, 676 F.3d 579, 582 (7th Cir. 2012). Halasa's notice of appeal predates the district court's order for costs and is thus not effective as to that order. See *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 468 (7th Cir. 1999) ("The notice of appeal from the order dismissing their suit could not bring up an order entered later.").

The notice of appeal, however, is not the only document that can satisfy the requirements of Appellate Rules 3 and 4. As the Supreme Court stated in *Smith v. Barry*, 502 U.S. 244, 248-49 (1992), "[i]f a document filed within the time specified by Rule 4 gives the notice required by Rule 3, it is effective as a notice of appeal." See also *In re Turner*, 574 F.3d 349, 354 (7th Cir. 2009) ("[R]equirements for perfecting an appeal that do not involve deadlines are not jurisdictional"). Thus in *Smith* the Court ruled that a timely filed appellate brief sub-

stituted for a properly filed notice of appeal. Here, Halasa's opening appellate brief was filed within 30 days of the district court's costs order, and it clearly gives notice of his intent to contest that ruling. We therefore have jurisdiction over this aspect of Halasa's appeal.

B

Halasa's appeal from the costs order presents a novel question: How should we reconcile provisions in the federal rules providing for the cost-shifting of expert discovery with statutes that impose limits on payable fees for expert witnesses? Formally, this requires us to consider whether the payment provisions of Federal Rule of Civil Procedure 26(b)(4)(E) supersede, by force of the Rules Enabling Act, 28 U.S.C. § 2072(b), the rules set forth in 28 U.S.C. § 1821, which governs witness expenses. The costs ITT would like to have reimbursed are for Lynch's deposition preparation, travel to and from his deposition, and time spent reviewing his deposition transcript.

The Rules Enabling Act authorizes the Supreme Court to "prescribe general rules of practice and procedure," 28 U.S.C. § 2071, and further provides that "[a]ll laws in conflict with such rules shall be of no further force or effect." *Id.* at § 2072(b). In order to ascertain the combined effect of Rule 26(b)(4)(E) and § 1821, we must first determine whether the payment provisions in Rule 26 postdate the relevant provisions of 28 U.S.C. § 1821. See *Jackson v. Stinnett*, 102 F.3d 132, 135 (5th Cir. 1996) (The supersession clause trumps "only statutes passed before

the effective date of the rule in question."). If this part of Rule 26 went into effect after the statute was passed, then we must decide whether there is a conflict between the rule and the statute. See *Collins v. Gorman*, 96 F.3d 1057, 1059 (7th Cir. 1996). If there is such a conflict, then under the supersession clause, the rule controls; if there is no conflict, then we must determine how to apply both the rule and the statute.

The first question is readily answered. As the Supreme Court explained in *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439-40 (1987), Congress in 1793 "enacted a general provision linking some taxable costs . . . to the practice of the court of the State in which the federal court sat." Dissatisfied with the widely divergent practices that persisted through the mid-nineteenth century, Congress passed the Act of Feb. 26, 1853, 10 Stat. 161, which comprehensively regulated fees and costs in the federal courts. *Crawford Fitting*, 482 U.S. at 440; see also *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2001 (2012). Those "sweeping reforms" have "carried forward to today," with occasional modifications by Congress. *Crawford Fitting*, 482 U.S. at 440. Notably for our purposes, Congress amended § 1821 in 1959 specifically to include "the taking of a deposition pursuant to any rule of a court of the United States." Thus, since 1959 the limitations on reimbursement set forth in § 1821 have applied not only to trial witnesses, but also to deposition witnesses. (This disposes of the timing issue that the parties have debated: *if* § 1821 applies, then it would govern any award of fees, whether the motion was made at the pre-trial stage, during the trial, or post-trial.)

By contrast, the provisions now appearing in Civil Rule 26(b)(4)(E) for the payment of expert witnesses in discovery were added after the 1959 amendment to § 1821. Subsection (b)(4) to Rule 26 was introduced with the 1970 amendments to the Civil Rules; it required a court to issue an order "that the expert be paid a reasonable fee for time spent in responding to discovery" and "that the party whose expert is made subject to discovery be paid a fair portion of the fees and expenses . . . incurred." See FED. R. CIV. P. 26, adv. comm. n. (1970 Amendment). These provisions took on their current form in 1993, after a major set of revisions, and were then renumbered as subsection (b)(4)(E) in the 2010 amendments. FED. R. CIV. P. 26, adv. comm. nn. (1993 Amendments, 2010 Amendments). In short, because the relevant statutory provision was enacted in 1959 and the relevant rule was promulgated in 1970 (and revised in 1993), the rule prevails over any inconsistent part of the statute.

But is there a conflict? There is surprisingly little law on this issue. The case that comes closest to addressing this issue is from the D.C. Circuit, but that court never squarely confronted the question now before us. It noted that "§ 1821(b) does in fact limit witness fees to $40 per day," *Haarhuis v. Kunnan Enter., Ltd.*, 177 F.3d 1007, 1015 (D.C. Cir. 1999), but then it went on to assume the answer to the question before us: whether that limit carries over to an award made under Rule 26 (then Rule 26(b)(4)(C)). After noting that the expert there was seeking fees under Rule 26, it apparently found that § 1821 was irrelevant, and then went on to

conclude that the award of a fee based on the expert's normal charge of $300 per hour for the time he spent "responding to the opposing party's discovery request" was "reasonable." *Id.;* see also *Trepal v. Roadway Express, Inc.*, 266 F.3d 418, 426-27 (6th Cir. 2001); *Anderson v. City of St. Louis*, 220 F.3d 898, 905 (8th Cir. 2000); *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 332-33 (5th Cir. 1995). The district courts have taken different approaches to the way in which § 1821 applies to motions for costs under Rule 26(b)(4)(E) when those particular items are also addressed in § 1821. Compare, *e.g.*, *United States v. Davis*, 87 F. Supp. 2d 82, 91 (D.R.I. 2000) ("no need to depart from th[e] rule" set out in *Crawford Fitting* in the context of Rule 26, and therefore limiting attendance fees to $40 per day); *Hm v. City of Creve Coeur*, No. 4:07-CV-00946, 2010 WL 1816693 at *2 (E.D. Mo. May 4, 2010) with *Jorden v. Steven J. Glass, MD*, No. 09-1715, 2010 WL 3023347 at *3 (D.N.J. July 23, 2010) (distinguishing between fee payable to deposition witness under § 1821 and fee payable to expert deposition witness under Rule 26(b)(4)).

There are respectable arguments both for reconciling the rule and the statute and for finding a conflict that would require giving precedence to the rule. The former conclusion would flow from literal adherence to *Crawford Fitting,* under which one would find that Rule 26 authorizes recoupment of expenses and § 1821 simply caps the amount that may be awarded. *Crawford Fitting* involved the computation of costs taxable under Rule 54; in that context, the Court found a way to harmonize the rule and the statute. It held that the effect

of the "language and interrelation" of § 1821 and Rule 54 (directing the entry of costs for a prevailing party) was (1) that the rule "provides that the cost shall be taxed against the losing party," (2) that another statute—28 U.S.C. § 1920—directs that witness fees were among the costs that could be taxed, and finally, (3) that "§ 1821 specifies the amount of the [witness] fee that must be tendered." 482 U.S. at 441. Although Rule 54 and Rule 26 provide distinct avenues of cost recovery, *Chambers v. Ingram*, 858 F.2d 351, 360-61 (7th Cir. 1988), the same methodology might apply to both, especially because nothing in § 1821 limits its rules to awards to prevailing parties. Under this view, one would say that Rule 26(b)(4)(E) directs a district court to "require" the payment of a reasonable or fair fee to compensate the expert for time spent in responding to discovery, FED. R. CIV. P. 26(b)(4)(E), but that the amount recoverable for certain components of the expert's expenses is dictated by statute. Section 1821 sets a mandatory cap on certain specified costs related to the taking of a "deposition pursuant to any rule or order of a court of the United States." 28 U.S.C. § 1821(a)(1). Those costs include an attendance fee of $40, actual expenses of travel, and a subsistence allowance consistent with federal law. See *id.* § 1821(b), (c), (d).

The other approach would reject such a close analogy to *Crawford Fitting* and Rule 54. To begin with, the language of the two rules is different. Rule 54(d) refers to "costs" generically, while Rule 26(b)(4)(E)(i) says that "[u]nless manifest injustice would result, the court *must* require that the party seeking discovery . . . pay the expert

a *reasonable* fee . . . ." (Emphasis added.) This amounts to a much more explicit expense-shifting mandate, and it also provides some guidance on the amount of costs (*i.e.*, a "reasonable" fee). In *Collins*, we observed that the 1993 amendments to the rules were "designed to reduce the expense of litigation without altering who must bear that expense." 96 F.3d at 1060. See also *Gwin v. American River Transp. Co.*, 482 F.3d 969, 975 (7th Cir. 2007) (stating that the relevant language of Rule 26, then in subpart (b)(4)(C), required only that "the expert's fees must be reasonable.") The Committee Notes that accompanied the addition of subpart (4)(E) confirm this view, stating that "[c]oncerns regarding the expense of such depositions [meaning those of experts, whether testifying or just for trial preparation] should be mitigated by the fact that the expert's fees for the deposition will ordinarily be borne by the party taking the deposition." FED. R. CIV. P. 26, adv. comm. nn. (1993 Amendments, Subdivision (b)).

In choosing between these two approaches, we think it important to pay heed to the differences between Rule 54 and Rule 26. Both rules direct the court to shifts some costs; but as we have noted, unlike Rule 54, Rule 26 sets out a substantive standard—a reasonable fee for time spent in responding to discovery. We think it unrealistic in the extreme to assume that $40 is by definition a "reasonable" fee. Rule 26's flexible reasonableness standard is "irreconcilabl[e]" with the hard-and-fast schedule embodied in § 1821. *Henderson v. United States*, 517 U.S. 654, 663 (1996). This is not a case where the statute and the rule both contain

flexible standards that can easily be read together. *United States v. Microsoft*, 165 F.3d 952, 959-60 (D.C. Cir. 1999). Rather, the rule operates to give courts the discretion to award a fee that appropriately compensates an expert witness, while application of the statute "extinguish[es] all discretion." *Crawford Fitting*, 482 U.S. at 446 (Marshall, J., dissenting). Importantly, § 1821 acknowledges that other laws may override its terms: it begins with the phrase "[e]xcept as otherwise provided by law." 28 U.S.C. § 1821(a)(1). Rule 26, the later-enacted of the two, does "otherwise provide[]." Although we consider it a close call, we conclude that the flexible authorization for a reasonable fee contained in Rule 26 supersedes the specific schedule outlined in § 1821(b). This means, as the district court held, that certain expenses and fees associated with experts are not capped by § 1821 when recovered under Rule 26.

ITT identified several items relating to Dr. Lynch for which it was seeking reimbursement: (1) deposition preparation, (2) travel to and from the deposition, and (3) time spent reviewing his deposition transcript. We agree with the district court that the fact that ITT did not seek these fees until it filed its bill of costs is of no moment; its request was timely. On the merits, we further find no abuse of discretion in the district court's conclusion that Dr. Lynch's total fee of $2,975.00 was reasonable, or in its award of costs in the amount of $33,401.04.

We AFFIRM the judgment of the district court.