**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-2151**

UNITED STATES EX REL. DAVID GRANT,

        Plaintiff – Appellant,

v.

UNITED AIRLINES INC.,

        Defendant – Appellee.

Appeal from the United States District Court for the District of South Carolina, at Charleston. David C. Norton, District Judge. (2:15-cv-00794-DCN)

Argued: September 27, 2018                Decided: December 26, 2018

Before WILKINSON, DUNCAN, and KEENAN, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Duncan wrote the opinion, in which Judge Wilkinson concurred. Judge Keenan wrote a separate opinion concurring in part and dissenting in part.

**ARGUED:** William Stephen Norton, MOTLEY RICE, LLC, Mt. Pleasant, South Carolina, for Appellant. Keith J. Harrison, CROWELL & MORING LLP, Washington, D.C., for Appellee. **ON BRIEF:** Louis M. Bograd, Washington, D.C., William P. Tinkler, MOTLEY RICE, LLC, Mt. Pleasant, South Carolina, for Appellant. Michael T. Cole, Erika Karnaszewski Fedelini, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Charleston, South Carolina; Jason M. Crawford, Charles D. Austin, CROWELL & MORING LLP, Washington, D.C., for Appellee.

DUNCAN, Circuit Judge:

Relator David Grant brought this qui tam action against his former employer, United Airlines, Inc. ("United"), under the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729, *et seq.* The district court dismissed Grant's second amended complaint (the "SAC") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, we affirm in part, reverse in part, and remand to the district court for proceedings consistent with this opinion.

I.

Grant was a Lead Aviation Maintenance Technician for United. From 2008 to 2014, he worked at Charleston Air Force Base ("CAFB"), where United provided engine maintenance services for the U.S. Air Force's fleet of Boeing C-17 Globemaster III military transport airplanes ("C-17s"). United performed this work pursuant to a series of subcontracts. The Air Force contracted with Boeing to manufacture and repair C-17s. Boeing, in turn, subcontracted with Pratt & Whitney ("P&W") to build and maintain F117 engines ("F117 engines") for the C-17s. Finally, P&W subcontracted with United to maintain and repair those F117 engines.

Specifically, the SAC alleges that pursuant to its subcontract with P&W, United was responsible for, inter alia, repairing, overhauling, and inspecting the F117 engines and accompanying parts. According to the SAC, United is the only company in the world that performs these services for F117 engines. The subcontract requires that repairs be conducted in accordance with numerous regulations for maintaining and

2

inspecting airplanes, including federal aviation regulations ("FAR"), P&W build standards, and Air Force Technical Orders ("Air Force T.O.") (collectively "the regulations"). The regulations required, for example, that United use specific tools that were calibrated to specified levels when conducting certain procedures and investigations. Grant alleges that because United's work was required to comply with the regulations, United violated the FCA by certifying repairs that did not meet those requirements as complete and serviceable and returning them to the Air Force for payment.

In his SAC, Grant alleges that from 2008 to 2014, he observed three specific practices that purportedly violated the FCA. First, Grant alleges several instances when United "pencil whipped" repairs, meaning it certified that work had been completed even when it had not. For example, an inspector employed by United reported being "[coerced] into not making write ups" regarding problematic engines and was instead asked to "make it disappear or shop for another investigator to sign the item off." J.A. 118–19. Second, Grant alleges several instances when United certified repairs that had been performed by uncalibrated and uncertified tools, in violation of the subcontract's requirements. For example, the SAC alleges that United was required under the regulations to conduct fluorescent penetrant inspections ("FPIs") for cracks in engine parts using a calibrated radiometer. However, between 2008 and 2014, United repeatedly certified that such inspections had been completed even when they were performed using an uncalibrated radiometer or without a radiometer at all; in fact, between December 2013 and March 2014, there was no radiometer at CAFB. Finally, the SAC alleges that

3

United allowed inspectors to continue certifying repairs even after their training and eye exams had expired.

The SAC further alleges that beginning in early 2014, Grant alerted United to numerous aircraft maintenance violations and was ultimately terminated a few months later. For instance, on February 19, 2014, Grant expressed his concerns that CAFB had no radiometer on the premises to United's Provisioning Coordinator, and later to one of United's F117 engine engineers who in response asked him, "[d]on't you have anything better to do than f[***] things up here?" J.A. 134–35. On March 5 and 13, 2014, he attended investigatory meetings where he discussed United's pencil whipping, failure to use a radiometer, and use of uncalibrated tools with several United managers. That same month, Grant was observed taking pictures of CAFB's FPI radiometer after it had been absent from the premises for five months. He was immediately escorted out of the building. On March 18, 2014, Grant alerted United's Managing Director of Maintenance about the use of "unserviceable" tools and management's knowledge of such use. Two days later, he wrote to the same managing director about these failures, observing that they could "result in catastrophic failure to an engine." J.A. 144. The next day, on March 21, 2014, Grant was informed that his employment would be terminated. A subsequent investigation into Grant's allegations in April 2014 "did not identify any areas of deficiency in the equipment or the training of personnel." *Id.* Ultimately, Grant was terminated on May 6, 2014.

4

## II.

On February 24, 2015, Grant filed a qui tam action against United alleging that United violated three provisions of the FCA. Specifically, Grant alleged that United "knowingly present[ed], or caus[ed] to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement material to a false or fraudulent claim," *id.* at § 3729(a)(1)(B); and unlawfully terminated Grant for "lawful acts done . . . in furtherance of an [FCA] action . . . or other efforts to stop 1 or more violations of [the FCA]," *id.* at § 3730(h)(1).

The district court dismissed Grant's SAC for failure to state a claim under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). It dismissed the first two claims under the FCA because the SAC failed to sufficiently allege that United ever presented, or caused another contractor to present, a false claim for payment to the government, as required by §§ 3729(a)(1)(A) and (B). The district court also dismissed the retaliation claim, reasoning that the SAC did not allege that Grant engaged in the type of activity that is protected by the FCA. This appeal followed.

## III.

First, we address Grant's claims under §§ 3729(a)(1)(A) and (B). We review de novo the district court's dismissal of a complaint for failure to state a claim under Rule 12(b)(6). *Garnett v. Remedi Seniorcare, LLC*, 892 F.3d 140, 142 (4th Cir. 2018). In our analysis, we consider only the allegations contained in the SAC. *See E.I. du Pont de*

5

*Nemours & Co. v. Kolon Indus. Inc.*, 637 F.3d 435, 449 (4th Cir. 2011) ("[M]atters beyond the pleadings . . . cannot be considered on a Rule 12(b)(6) motion.").

A.

Generally, a complaint will survive a Rule 12(b)(6) motion to dismiss if it "state[s] a claim to relief that is plausible on its face," meaning that it pleads sufficient facts to support a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). However, fraud-based claims must satisfy Rule 9(b)'s heightened pleading standard. *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455–56 (4th Cir. 2013). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Claims arising under §§ 3729(a)(1)(A) and (B) of the FCA are fraud-based claims that must satisfy Rule 9(b)'s pleading standard. *Nathan*, 707 F.3d at 455–56. The FCA protects the government against false claims that are presented to it in federal contracts. All FCA claims require, among other elements, that the false statement or conduct "caused the government to pay out money or to forfeit money due." *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003) (*Harrison II*). Section 3729(a)(1)(A) of the FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Section 3729(a)(1)(B) of the FCA prohibits any

6

person from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

In order for a false statement to be actionable under either subsection of the FCA, it must be made as part of a false or fraudulent claim. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786 (4th Cir. 1999) ("The statute attaches liability not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'") (alterations omitted). A "claim" is "any request or demand, whether under a contract or otherwise, for money or property that . . . is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2)(A) & (A)(i). Therefore, a central question in all FCA cases is whether the defendant ever presented a false or fraudulent claim to the government, resulting in a "call upon the government fisc." *Harrison*, 176 F.3d at 785–86.

We have previously explained the requirements for pleading presentment with particularity. In *Nathan*, we held that Rule 9(b)'s particularity requirement "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government."[1] *Id.* at 457 (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)). Rather, Rule 9(b) requires that the

---

[1] The dissent points out that *Nathan* addressed a claim under § 3729(a)(1)(A), whereas Grant also asserts a claim under § 3729(a)(1)(B). However, the requirement that a false claim be submitted to the government applies to all FCA claims. *Harrison*, 176 F.3d at 785–86.

complaint provide "some indicia of reliability" to support the allegation that an actual false claim was presented to the government. *Id.* (quoting Fed. R. Civ. P. 9(b)).

In affirming Rule 9(b)'s stringent pleading standard, we are not, as the dissent would suggest, unsympathetic to the practical challenges that complainants may face, especially where billing practices and records are not readily ascertainable to certain categories of employees within a company. However, Rule 9(b)'s particularity requirement serves as a necessary counterbalance to the gravity and "quasi-criminal nature" of FCA liability. *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2016). An entity found in violation of the FCA may be liable for treble damages, *see* 31 U.S.C. § 3729(a)--a punishment which carries potentially crippling consequences, particularly to private employers. *See United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 393 (4th Cir. 2015) (Wynn, J., concurring) (expressing concern that the FCA's potential for treble damages "will result in a likely death sentence for a community hospital in an already medically underserved area"). Thus, Rule 9(b)'s purposes of providing defendants notice of their alleged misconduct, preventing frivolous suits, and eliminating fraud actions in which all the facts are learned after discovery apply with special force to FCA claims and the accompanying presentment requirement. *See Nathan*, 707 F.3d at 456 (quoting *Harrison*, 176 F.3d at 784).

Accordingly, there are two ways to adequately plead presentment under Rule 9(b). First, a plaintiff can "allege with particularity that specific false claims actually were presented to the government for payment." *Id.* at 457. This standard requires the plaintiff to, "at a minimum, describe 'the time, place, and contents of the false

8

representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *Harrison*, 176 F.3d at 784). Alternatively, a plaintiff can allege a pattern of conduct that would "*necessarily* have led[] to submission of false claims" to the government for payment. *Nathan*, 707 F.3d at 457. Because neither party disputes that the SAC fails to identify a specific false claim that was presented to the Air Force for payment, we focus our analysis on whether Grant can allege a pattern of conduct that would necessarily have led to a false claim being submitted.

## B.

Given the standard laid out above, Grant fails to set out an FCA claim under either §§ 3729(a)(1)(A) or (B) with the requisite particularity. We address each in turn.

### i.

Grant fails to state a claim under § 3729(a)(1)(A) because while the allegations state with particularity that United engaged in at least some fraudulent conduct, the SAC fails to provide the last link which is critical for FCA liability to attach: namely, that this scheme necessarily led to the presentment of a false claim to the government for payment.

We acknowledge, as the dissent points out, that the SAC adequately pleads that United engaged in at least some underlying fraudulent conduct. The SAC alleges that

9

United is the only company in the world that provides the relevant services for the F117 engines, that United was required to extensively document its compliance with regulations, that United engaged in conduct such as pencil whipping and using improper tools, and that the Air Force had contracted with Boeing for an umbrella payment of $11.75 billion, $218 million of which was earmarked for C-17 expenses and $10 million for P&W's F117 engines. In addition, the SAC identifies several types of fraudulent actions, including that United certified that it had performed FPIs for cracks on F117 engine components when it had not. For example, even though the facility at which these FPIs were conducted did not possess any radiometer between December 2013 and March 2014, United repeatedly certified that it had completed the inspections that required the use of a radiometer during that period.

However, the SAC fails to allege how, or even whether, the bills for these fraudulent services were presented to the government and how or even whether the government paid United for the services. Merely alleging fraudulent conduct and an umbrella payment, without more, is insufficient particularly where, as the SAC itself alleges, United is three levels removed from the Air Force, which contracts directly with Boeing. By contrast, in *Lusby* and *Lockhart*, cases on which Grant relies, the defendant contracted *directly* with the government, and the complaint provided at least some explanation of the billing structure. *See, e.g.*, *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854–55 (7th Cir. 2009) (satisfying the presentment requirement where the defendant directly contracted with the U.S. military and received payment for non-compliant engine parts); *United States ex rel. Lockhart v. Gen. Dynamics Corp.*, 529

10

F. Supp. 2d 1335, 1336, 1341 (N.D. Fl. 2007) (satisfying the presentment requirement where the defendant sold ammunition propellant directly to the U.S. military and the relator had first-hand knowledge that required tests were not completed). Absent some explanation of the billing structure or how or whether the government paid for repairs in this subcontracting scheme, Grant has not shown that false claims were necessarily presented to the government for payment for two reasons.

First, the SAC leaves open the possibility that the government was not billed for and accordingly never paid for the particular alleged fraudulent repairs. It is possible that P&W and Boeing, the intervening subcontractors, declined to bill the government for all the repairs or that the government refused to pay the full amount.

Second, even assuming that Grant properly alleged that the government was billed for all the repairs--which he has not--the SAC leaves open the possibility that any fraudulent repairs were remedied prior to government payment. P&W or Boeing may have caught any defects and fixed them prior to billing the government. United itself also could have remedied fraudulent repairs. Indeed, the SAC describes at least one instance when an engine that was certified as complete despite having been improperly serviced was taken "back out on the shop floor for maintenance" for another issue, and the "original discrepancy was finally repaired." J.A. 120. Without some explanation as to the billing and payment structure, it is possible the government was not billed for or did not pay for these repairs until they were remedied. Accordingly, though Grant's allegations *could* have led to presentment, because the SAC fails to explain how United billed for its work or when the government paid for repairs, we cannot determine even

11

from circumstantial allegations that United's conduct would have *necessarily* led to a false claim being submitted to the government for payment.

Grant's counterarguments on appeal fail to remedy these deficiencies. Grant argues that, as a practical matter, P&W and Boeing could not identify United's false certifications ex post due to the nature of the alleged fraudulent activity--pencil whipping and failing to use indispensable tools. Grant also argues that upon completing its repairs, United returned the engines directly to the Air Force, so there was therefore no opportunity for P&W and Boeing to inspect United's work. As a factual matter, the SAC's description of the chain of custody once an engine has been serviced is unclear.[2] Grant points out that United sends the purportedly repaired engines to "serviceable pools" at CAFB and other bases for immediate use by the Air Force. *See* J.A. 99 ("The engines will be built-up . . ., tested and ready for immediate installation and use on the C-17 aircraft."); J.A. 120 (explaining that an engine that had not been repaired as certified "was put into serviceable the [sic] spare engine pool barn"). Yet even accepting this point with respect to the engines, both arguments fail to overcome the fatal deficiencies of the SAC with respect to the billing: the SAC's silence on how or when the government was billed for this work leaves open the possibility that the government was never billed

_____

[2] The SAC alleges, for example, that "repaired engines, inlets, and CTRs . . . return from United *to Pratt & Whitney*, and ultimately the Air Force." J.A. 110 (emphasis added). The SAC thus even belies the contention that the direct return of engines to the Air Force necessarily led to a false claim being submitted to the government.

for the work, or if it was billed then, as occurred on at least one occasion, falsely repaired engines were properly remedied before the government paid for them.

Grant therefore fails to allege an impact on the government fisc with the requisite particularity to survive a motion to dismiss under Rule 9(b)'s heightened pleading standard.

Contrary to the dissent's suggestion, our holding in no way requires a relator to produce documentation or invoices at the outset of the suit, *see Lusby*, 570 F.3d at 854, nor are subcontractors or employees who do not have specific knowledge of a company's financial and billing structure precluded from adequately pleading FCA claims, *see Harrison II*, 352 F.3d at 921–22. We only conclude that Rule 9(b)'s heightened pleading standard requires that plaintiffs connect the dots, even if unsupported by precise documentation, between the alleged false claims and government payment. This is especially so where, as here, the contractual relationship between the defendant and subcontractor is so attenuated. *See Nathan*, 707 F.3d at 457. *Nathan* tells us clearly that an FCA plaintiff may not merely describe a private scheme and then "allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Id.* (internal quotation marks and citation omitted).

Here, we find that the complaint lacks any allegation--for instance, that upon information and belief, bills are routinely sent to the government upon completion of repairs and are routinely paid as presented--that fills that gap. To the contrary, United is three steps removed from the government, and though Grant alleges with specificity

13

some instances of United's fraudulent conduct, the complaint makes no specific allegation as to whether or how any statement containing a false claim was presented to or paid for by the government, as it must. *See Harrison*, 176 F.3d at 785. Accordingly, the complaint fails to state a claim under § 3729(a)(1)(A).

ii.

Grant's claims under § 3729(a)(1)(B) fail for similar reasons. It is true, as the dissent points out, that § 3729(a)(1)(B) does not require that the defendant itself "present" the false claim to the government. Instead, this provision is satisfied where the defendant makes or uses a false record that is material to a false claim. Nevertheless, a plaintiff asserting an FCA claim is still required to show that a false claim was submitted to the government. *See Harrison*, 176 F.3d at 785 ("Therefore, a central question in False Claims Act cases is whether the defendant ever presented a 'false or fraudulent claim' to the government."). The complaint thus fails to state a claim under § 3729(a)(1)(B) for essentially the same reasons as under § 3729(a)(1)(A).

The gravity of FCA liability reinforces the importance of pleading with particularity that there was a false claim and that the false claim was presented to the government for payment. Here, by failing to articulate the latter, Grant's SAC fails to satisfy this stringent requirement. Accordingly, we hold that the district court properly dismissed Grant's SAC as to the substantive FCA claims under §§ 3729(a)(1)(A)–(B).

14

## IV.

We now turn to Grant's separate allegation that United retaliated against him for complaining about its alleged fraud, in violation of the FCA's whistleblower provision, 31 U.S.C. § 3730(h). This provision prohibits retaliation "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

Unlike Grant's substantive FCA claims, retaliation claims under § 3730(h) are not subject to Rule 9(b)'s heightened particularity requirement. Instead, a plaintiff need only satisfy Rule 8(a)'s notice-pleading standard. *See* Fed. R. Civ. P. 8(a). Accordingly, to sufficiently plead a § 3730(h) retaliation claim and thus survive a motion to dismiss, a plaintiff must allege facts sufficient to support a "reasonable inference" of three elements: (1) he engaged in protected activity; (2) his employer knew about the protected activity; and (3) his employer took adverse action against him as a result. *See Iqbal*, 556 U.S. at 678; *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015). As to the first element, § 3730(h) defines two types of protected activity--acts "in furtherance of an [FCA action]" (the "first prong"), or "other efforts to stop 1 or more [FCA violations]" (the "second prong"). 31 U.S.C. § 3730(h)(1). We conclude that the district court erred in finding that Grant had not made the necessary showing.

15

A.

Before turning to the merits of Grant's retaliation claim, we clarify the relevant legal standards that govern the two categories of "protected activity" articulated in § 3730(h) following the 2009 and 2010 amendments to the statute.

Prior to 2009, Section 3730(h) originally defined protected activity as measures taken "in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." *See* False Claims Amendments Act of 1986, Pub. L. 99-562, § 4, 100 Stat. 3153, 3157–78 (1986). In interpreting this provision, we applied the "distinct possibility" standard: employees engaged in protected activity when "litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility." *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. 2010) (quoting *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 869 (4th Cir. 1999)). Whether the distinct possibility standard is met is determined from the "perspective of the facts known by the employee at the time of the protected conduct." *Id.* at 345.

In 2010, Congress amended § 3730(h) to include a second category of protected activity: that which constitutes "*other efforts to stop 1 or more violations of* [the FCA]."[3]

---

[3] The statute was amended twice, once in 2009 and in 2010. The 2009 amendment removed all references to an FCA action and defined protected activity as "lawful acts done . . . in furtherance of other efforts to stop 1 or more violations" of the FCA. *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617, 1624–25 (2009).

16

31 U.S.C. § 3730(h) (emphasis added). A plain reading of this provision suggests the incongruousness of attempting to subject it to the "distinct possibility" standard. The apparent purpose of the amendment is to untether these newly protected efforts from the need to show that an FCA action is in the offing. Indeed, we and other circuits have recognized that the amended language broadens the scope of protected activity. *See Smith*, 796 F.3d at 434 ("While we have not yet spelled out the contours of 'other efforts to stop' a False Claims Act violation, it plainly encompasses more than just activities undertaken in furtherance of a False Claims Act lawsuit."); *see also United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 59 n.8 (1st Cir. 2017); *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847–48 (7th Cir. 2012). Where Congress expands the scope of activity protected by a statute, we cannot restrict ourselves to applying a narrower old standard that the expansion was intended to eschew.

The district court in this case dismissed Grant's retaliation claim, finding that he had not sufficiently alleged that he engaged in protected activity under the FCA. In so determining, the court applied the "distinct possibility" standard. On appeal, Grant argues that this standard does not govern protected activities under § 3730(h)'s second prong and that, applying the "objective reasonableness" standard, his alleged actions constitute protected activity. We agree.

We find that the distinct possibility standard does not apply to § 3730(h)'s second prong and adopt the objective reasonableness standard for protected activity under this prong. In so doing, we note that this standard is not unfamiliar as applied to the FCA's whistleblower provision. For instance, in *Mann*, which was decided before the 2009

17

amendments, we applied the distinct possibility standard but explained that the distinct possibility standard "requires that protected activity relate to company conduct that involves an *objectively reasonable* possibility of an FCA action." 630 F.3d at 344 (emphasis added).[4] Under this standard, an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA. A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA. However, while the plaintiff's actions need not "lead to a viable FCA action" as required under the distinct possibility standard, they must still have a nexus to an FCA violation.[5]

---

[4] Indeed, several of our sister circuits applied this test to the pre-amended statute. *See Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 479–80 (7th Cir. 2004) (holding that an employee engages in protected activity under § 3730(h) where "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government"); *Wilkins v. St. Louis*, 314 F.3d 927, 933 (8th Cir. 2002); *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845–46 (9th Cir. 2002).

[5] We note that one circuit still requires that an act "reasonably could lead to an FCA action" in order to be protected under § 3730(h)'s amended language. *See Pfizer*, 847 F.3d at 59 & n.8 (explaining that the amendment does not alter the standard for protected activity--activity that "reasonably could lead to an FCA action"--because the pre-amendment standard covered actions that might not be taken in direct furtherance of an actual lawsuit) (internal quotation marks and citation omitted).

B.

Having clarified the appropriate standard for protected activities under § 3730(h)'s second prong, we now determine whether the district court erred in dismissing Grant's retaliation claim because he "fail[ed] to allege that he conducted any investigation or took any steps in furtherance of commencing a FCA action before his termination." J.A. 292. We conclude that it did.

Under the objective reasonableness standard that governs the second prong of protected activity, we find that the SAC sufficiently alleges that Grant was engaged in protected activity where he had an objectively reasonable belief that United was violating the FCA and that his actions were designed to stop at least one violation of the FCA. The SAC alleges that Grant complained on multiple occasions in person and in writing about United's pencil whipping and failure to use proper tools. These complaints did not merely express concern about regulatory non-compliance, but instead alleged specific illegal, fraudulent conduct against the government. For example, the SAC alleges that Grant wrote an email to United's Managing Director of Maintenance, accusing United of trying to "pass the buck to our customer the US Air Force who is paying good money to have us fix these discrepancies." J.A. 119–20.

Taking the facts alleged as true, it was objectively reasonable for Grant to believe that United had committed fraud. The incident that prompted Grant to email the managing director involved an inspector who reported being "[coerced] into not making write ups" regarding problematic engines; the inspector was instead asked to "make it

19

disappear or shop for another investigator to sign the item off." J.A. 118–19. It was therefore objectively reasonable for Grant to believe that United had committed fraud.

Finally, the SAC supports a reasonable inference that Grant's actions were designed to stop one or more violations of the FCA. Grant alleges that he observed United coercing investigators to falsify engine repairs, which he believed harmed their "customer the US Air Force," and that he raised concerns about this practice to management in an email that included supporting documents. J.A. 119–20. As in *Halasa*, this is sufficient to permit a trier of fact to find that Grant engaged in "efforts to stop" a potential FCA violation. *See Halasa*, 690 F.3d at 848 (finding an FCA retaliation claim where the complainant investigated suspected FCA violations and reported his findings "presumably to ensure that [the defendant] ended these practices and to prevent [it] from making any false certifications to the USDOPT"). The facts alleged in the SAC therefore sufficiently establish that Grant's actions were designed to stop at least one violation of the FCA. *See United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 98 n.34 (2d Cir. 2017) ("[Section] 3730(h) does not protect only efforts to prompt an investigation or change a company's general principles; it protects an effort to prevent *even one violation* of the False Claims Act.") (emphasis added). Accordingly, the district court erred in holding that Grant was not engaged in protected activity.

Because the district court determined that Grant had not sufficiently pleaded that he engaged in protected activity, it did not address the second and third elements required to make out an FCA retaliation claim: that the employer knew about his protected activity

20

and took adverse action as a result.  We now determine that the SAC sufficiently pleaded these elements.

As to the second element, Grant sufficiently pleaded that United knew about his protected activity.  Here, Grant complained to United management on numerous occasions in person and in writing about the company's allegedly fraudulent conduct.  At least some of his complaints triggered an investigation into whether "the machine shop was operating faulty equipment and failing to train employees."  J.A. 144.  This suffices to satisfy the knowledge prong.

With respect to the third element, the timeline of events alleged in the SAC supports a reasonable inference that United terminated Grant because he engaged in protected activity.  In March 2014, Grant voiced his concerns about United's pencil whipping and other fraudulent conduct to several United managers.  That same month, after Grant was observed taking pictures of CAFB's new FPI radiometer--presumably in furtherance of his complaints--he was immediately escorted out of the building.  Soon after, he wrote an email to the Managing Director of Maintenance about how United's fraudulent conduct could "result in catastrophic failure to an engine."  J.A. 144.  The next day he was informed that his employment would be terminated.

"An employer undertakes a materially adverse action opening it to retaliation liability if it does something that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Smith*, 796 F.3d at 434 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67–68 (2006)).  Here, Grant's termination, following close on the heels of his numerous complaints, represents the

ultimate action that an employer can take against a reasonable worker for whistleblowing. *See, e.g.*, *Sec'y of Labor v. Mut. Mining, Inc.*, 80 F.3d 110, 112 (4th Cir. 1996) (holding that, inter alia, the timing of layoffs supported a finding of retaliation for acts protected under the Federal Mine Safety and Health Act where the layoffs occurred shortly after workers' complaints triggered an inspection).

Accordingly, we hold that Grant has successfully pleaded retaliation under § 3730(h). The district court thus erred in holding that Grant failed to plead sufficient facts to withstand a motion to dismiss.

V.

For the foregoing reasons, we affirm the district court's dismissal of Grant's SAC as to the § 3729(a)(1)(A) and § 3729(a)(1)(B) claims, and we reverse the district court's dismissal of Grant's retaliation claim under § 3730(h).

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

BARBARA MILANO KEENAN, Circuit Judge, concurring in part and dissenting in part:

I concur in Part IV of the majority opinion vacating the district court's dismissal of Grant's retaliation claim. I write separately with respect to Part III because, in my view, Grant has alleged his FCA claims with sufficient particularity under Rule 9(b) and our decision in *United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc.*, 707 F.3d 451 (4th Cir. 2013).

The Rule 9(b) standard for pleading fraud is a demanding one. In the majority of cases, a relator "must allege with particularity that specific false claims actually were presented to the government for payment." *Nathan*, 707 F.3d at 457. In some circumstances, however, we can infer from the nature of the scheme itself, as well as "specific allegations of the defendant's fraudulent conduct," that a false claim necessarily was presented to the government. *Id.* At the heart of this "necessarily presented" standard is the recognition that a relator need not allege direct evidence of presentment to satisfy Rule 9(b), but may rely on circumstantial evidence to raise a plausible inference that a false claim was presented.

The majority ignores this holding in *Nathan* that allegations of circumstantial evidence can satisfy Rule 9(b). Instead, the majority requires that a relator allege direct evidence of presentment at the pleading stage, in the form of invoices or other knowledge of the company's "billing and payment structure," without the benefit of discovery. As a result, the majority effectively limits *qui tam* actions to whistleblowers in "white collar" positions with access to financial and other business records. Yet, as demonstrated here,

the employees in the best position to discover unsafe or noncompliant practices often do not work in the accounting department of a company, but instead work in jobs with "front row seats" to the fraudulent conduct itself. So long as a relator's allegations of fraud "necessarily le[ad] to the plausible inference that false claims were presented to the government," *Nathan*, 707 F.3d at 457, I would decline to restrict the ability to sue under the FCA to relators with access to a company's financial records.

Applying these principles to the present case, I would conclude that the "necessarily presented" standard is satisfied here. Most notably, Grant, who worked as an aviation maintenance technician, alleges that over a four-month period between December 2013 and March 2014, United "was not in possession of *any* FPI radiometer," a tool required for certain repairs. United nevertheless continued to "sign off" on documentation "indicating that [United] had completed repairs, overhauls, and inspections requiring" the use of a radiometer.[1] Grant further alleges that the Air Force paid over $1.5 billion for United's maintenance services through late 2014.[2] Grant thus

---

[1] Grant also alleges that over a five-year period from 2008 to December 2013, United did not possess a "calibrated black light or FPI radiometer." Yet United also "sign[ed] off" on documentation certifying that United had completed work requiring this equipment.

[2] I agree with the majority that allegations of an "umbrella payment," without more, would be insufficient to prove presentment at summary judgment or trial. In my view, however, the allegations of payment in the second amended complaint are sufficient to raise the plausible inference at the pleading stage that at least one false claim was presented to the government for payment.

has identified a particular type of noncompliant repair that was completed during a narrow time period covered by the government's payments.

Given the specificity of these allegations, Grant has not filed "baseless claims as a pretext to gain access to a 'fishing expedition.'" *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 191 (5th Cir. 2009). Nor does the complaint fail to provide United with "sufficient information to formulate a defense by putting [United] on notice of the conduct complained of." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted) (explaining purposes of Rule 9(b)). In my view, the allegations in this complaint are more than adequate to state a claim of fraud with particularity.

The present case starkly illustrates the risk posed by the majority's unnecessarily restrictive view of Rule 9(b). By declining to review claims by relators like Grant, we close the courthouse doors to allegations of dangerous misconduct, including in this case the egregious example of military aircraft allegedly receiving sub-standard or non-existent maintenance services. Without relators like Grant, such fraudulent schemes might never be brought into the light of day, contrary to the intent of Congress in enacting the FCA. For these reasons, I would vacate and remand the district court's dismissal of Count 1 of Grant's second amended complaint, alleging a claim under 31 U.S.C. § 3729(a)(1)(A).

I also would vacate the district court's dismissal of Count 2, alleging a false records claim under 31 U.S.C. § 3729(a)(1)(B). That provision imposes FCA liability when any person "knowingly makes, uses, or causes to be made or used, a false record or

25

statement material to a false or fraudulent claim." *Id.* In my view, Grant sufficiently has alleged a plausible claim under this separate provision of the statute. Moreover, this Court recently has clarified that the "presentment requirement from § 3729(a)(1)(A) . . . is not present in § 3729(a)(1)(B)," the false records provision.[3] *United States ex rel. Badr v. Triple Canopy, Inc.*, 775 F.3d 628, 639 (4th Cir. 2015), *reinstated by* 857 F.3d 174 (4th Cir. 2017); *see also Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671-72 (2008) ("What [precursor false records provision] § 3729(a)(2) demands is not proof that the defendant caused a false record or statement to be presented or submitted to the Government but that the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'"). Accordingly, I would remand Count 2 to the district court for further proceedings.

---

[3] I observe that there were not any false records claims under Section 3729(a)(1)(B) at issue on appeal in *Nathan*. *See* 707 F.3d at 453 n.1.