**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-2101

UNITED STATES EX REL. LISA WHEELER; STATE OF NORTH CAROLINA
EX REL. LISA WHEELER,

Plaintiffs - Appellants,

v.

ACADIA HEALTHCARE COMPANY, INC.; CRC HEALTH, LLC; ATS OF
NORTH CAROLINA, LLC, d/b/a Mountain Health Solutions Asheville, d/b/a
Asheville Comprehensive Treatment Center, d/b/a Mountain Health Solutions North
Wilkesboro, d/b/a North Wilkesboro Comprehensive Treatment Center,

Defendants - Appellees.

Appeal from the United States District Court for the Western District of North Carolina, at
Asheville.  Martin K. Reidinger, Chief District Judge.  (1:21-cv-00241-MR-WCM)

Argued:  September 26, 2024                          Decided:  February 3, 2025

Before HARRIS, HEYTENS and BERNER, Circuit Judges.

Reversed by published opinion.  Judge Berner wrote the opinion, in which Judge Harris
and Judge Heytens joined.

**ARGUED:**  Tejinder Singh, SPARACINO PLLC, Washington, D.C., for Appellants.
Jennifer Lyn Weaver, HOLLAND AND KNIGHT, LLP, Nashville, Tennessee, for
Appellees. **ON BRIEF:**  Gary W. Jackson, Kaitlyn E. Fudge, LAW OFFICES OF JAMES

SCOTT FARRIN, Durham, North Carolina; William N. Nettles, Frances C. Trapp, John L. Warren III, LAW OFFICE OF BILL NETTLES, Columbia, South Carolina, for Appellants.  Andrew F. Solinger, HOLLAND AND KNIGHT LLP, Nashville, Tennessee, for Appellees.

―――――――――

BERNER, Circuit Judge:

Congress enacted the False Claims Act in 1863 to provide a mechanism for the government to redress fraud in government procurement during the Civil War. Congress substantially strengthened the Act with the passage of the False Claims Act of 1986, and further strengthened it with the Fraud Enforcement and Recovery Act of 2009. The False Claims Act incentivizes whistleblowers, deemed "relators," to come forward when they become aware of fraud against the government, and to protect them from retaliation when they do.

The False Claims Act is a powerful tool for recovering taxpayer dollars to the public fisc. It punishes companies that have committed fraud in government contracts and serves an important function in deterring other companies from doing the same. In the fiscal year ending September 30, 2023, alone, the Department of Justice reported over $2.68 billion recovered through False Claims Act settlements and judgments. Fully two-thirds of that amount was collected from healthcare companies. Employees in the healthcare industry, including frontline workers who provide direct services to patients, are often in the best position to observe these fraudulent billing practices. Lisa Wheeler, formerly the Assistant Medical Director at Acadia Healthcare Company's Asheville, North Carolina clinic, was one such worker.

Acadia contracted with the government under Medicare, Medicaid, and other government-funded healthcare programs to render methadone-assisted treatment to patients suffering from opioid use disorder. The payment plans for these addiction treatment programs required Acadia to provide patients therapy and counseling, in addition

3

to methadone treatment. Wheeler became aware that Acadia was not providing the requisite therapy and counseling. Instead, Acadia was falsifying medical records—fabricating fake therapy notes from whole cloth—and relying in part on these falsified records to submit claims to the government for payment. Wheeler filed a complaint against Acadia alleging a number of violations of the False Claims Act. After the government declined to intervene in the case, Wheeler amended her complaint. Upon review of Acadia's motion to dismiss for failure to state a claim, the district court dismissed Wheeler's amended complaint in its entirety. We reverse.

## I. Background

Because this is an appeal from an order granting a motion to dismiss, we accept as true the factual allegations in Wheeler's amended complaint. *De'lonta v. Johnson*, 708 F.3d 520, 522 (4th Cir. 2013). Accordingly, we recite the facts as she alleges.

### A.

To combat the opioid crisis and provide treatment for those suffering from substance use disorders, Congress permits certain healthcare providers to administer methadone and other similar synthetic opiates[1] in narrowly prescribed conditions. One such condition is that clinics which prescribe and distribute methadone must also provide patients with therapy and counseling services. This requirement enforces the federal scheme to combat

---

[1] Because the distinction between these drugs is generally not relevant here, we employ the term "methadone" to include all similar synthetic opiates used in opioid use disorder treatment.

4

rampant opioid use disorder: prescribing methadone to help the patient cope with short-term cravings and withdrawal symptoms, together with providing counseling and therapy services to address the underlying cause of the patient's opioid use disorder.

The Controlled Substances Act, which established this scheme, limited the administration of methadone to Opioid Treatment Programs (OTPs) that have been certified by the Substance Abuse and Mental Health Services Administration (SAMHSA). 42 C.F.R. § 8.11; *see also* 21 U.S.C. § 823(h). To obtain certification, OTPs must meet certain specified opioid treatment standards, any relevant state standards, and possess current, valid accreditation from a SAMHSA-approved accreditation body. 42 C.F.R. § 8.12. Federal law requires OTPs to:

- "provide adequate medical, counseling, vocational, educational, and other screening, assessment, and treatment services" and "be able to document that these services are fully and reasonably available to patients," 42 C.F.R. § 8.12(f)(1);

- prepare a treatment plan that contains "medical and psychiatric, psychosocial, economic, legal, housing, and other recovery support services that a patient needs and wishes to pursue" and identifies "the recommended frequency with which services are to be provided." *Id.* § 8.12(f)(4). "The plan must be reviewed and updated to reflect responses to treatment and recovery support services," *id.*;

- "provide adequate substance use disorder counseling and psychoeducation to each patient as clinically necessary and mutually agreed-upon, including harm reduction education and recovery-oriented counseling," in order "to contribute to the

5

appropriate care plan for the patient and to monitor and update patient progress," *id.* § 8.12(f)(5); and

- "establish and maintain a recordkeeping system that is adequate to document and monitor patient care," *id.* § 8.12(g).

Government healthcare programs, including Medicare and Medicaid, pay OTPs to provide methadone-assisted treatment to persons with substance use disorders.

Under Medicare, which funds healthcare for the elderly and disabled, the OTP submits weekly "bundled" payments, rather than billing for individual services. *See* 42 C.F.R. § 410.67(d). To qualify for weekly payment, an OTP must furnish the patient with at least *one* opioid use disorder treatment service during that week. 42 C.F.R. § 410.67(b)(i)-(v). These treatment services include providing medication or counseling services such as "individual and group therapy." *Id.* Medicare regulations outline two types of bundled payments—payments based on weeks where a patient received medication and payments based on weeks where a patient did not receive medication. *Id.* § 410.67(d)(2).

When medication is provided through a Medicare plan, the bundled rate depends on the type of drug provided. Below is one relevant example of a billing code for a Medicare bundled payment:

> Code G2067: Medication assisted treatment, methadone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program).
> **Drug Cost:** $37.38
> **Nondrug Cost:** $178.29
> **Total Cost:** $215.67

6

J.A. 45. The non-drug component—often the largest share of the weekly Medicare payment—covers costs including counseling and therapy. *See* 42 C.F.R. § 410.67(d)(2)(ii).

In contrast to the Medicare's bundled payments, Medicaid, which provides healthcare to poor people and people with disabilities, and other government healthcare programs, including TRICARE and the Veterans Health Administration, pay providers for opioid treatment services on a fee-for-service basis. This means that providers submit bills and are paid for specific services provided.

### B.

Acadia Healthcare Company is one of the largest addiction treatment and behavioral healthcare service providers in the United States. The other defendants, CRC Health, LLC and ATS of North Carolina, LLC, are subsidiaries of Acadia Healthcare Company. We refer to the defendants, collectively, as "Acadia."

Lisa Wheeler is a physician assistant who served as the Assistant Medical Director of Acadia's Asheville, North Carolina clinic. She treated patients suffering from addiction, and her job required her "to handle physical assessments of patients and prescribe appropriate doses" of medications that would help them combat substance use disorders. J.A. 79. Wheeler worked at the Asheville clinic from January 2014 through December 2021.

Acadia's Asheville clinic provided substance use disorder treatment to many patients who relied on government healthcare programs. In fact, about 65 percent of Acadia's annual revenue came from Medicare and Medicaid. Acadia provided methadone-assisted treatment services to government healthcare beneficiaries. As such, Acadia was

required to comply with the federal regulations for OTPs. Pursuant to those requirements, Acadia prepared individual treatment plans for each patient. Therapy and counseling were to be "integral parts of every patient's treatment plan." J.A. 79. New patients were "supposed to be seen at least twice a month for counseling with a clinic-contact at least every week," and "established patients [were] to receive counseling at least once per month." J.A. 81.

Beginning in September 2020, Wheeler noticed that the Asheville clinic was documenting that its patients were receiving group therapy, but she was unaware that such therapy had been provided. J.A. 81. Wheeler began asking her patients about their group therapy and her patients told her that Acadia had not provided such therapy for over two years. Rather than providing therapy, Acadia's therapists and counselors were signing off on false treatment notes for "impromptu lobby group," "continuous lobby group," "sidewalk group," "telehealth group therapy sessions," and "bibliotherapy." J.A. 81. These group therapy sessions never took place.

Acadia's therapists would sign off on verbatim—or nearly verbatim—group therapy notes for different patients and different counselors. They would also submit identical fraudulent group therapy notes for the same patient on different dates. The notes for these falsified therapy sessions often contained significant detail, including descriptions of conversations between participants. For example, a medical record belonging to one patient, who Wheeler called "Patient 1," said that the patient had participated in an "impromptu lobby group" on September 2, 2020. J.A. 82. The subject was "Relapse is Not a Sign of Failure." J.A. 82. That medical record read in full:

8

Group members were asked what they thought the analogy about the flooded house meant. The overall majority of the clients were able to find the meaning. One client wrote, "…just deciding to get clean doesn't fix the damage to your body and brain." Another wrote, "quitting illicit drugs doesn't solve your problems, but it stops it from becoming worse."

Clients were then asked if they felt like they had, at this point, completely "turned off the faucet" at this time. Answered (sic) varied in regards to their current recovery effort. Those who answered, "yes" were asked about the damages they've repaired. Client's discussed their accomplishments in "people, places and things," "family relationships," "self-esteem," and "overcoming the stigma attached to being an addict "," continued illicit free urinalysis screens", and "removing the numbers from the telephone and staying clear of old hangouts", etc.

Assessment: All clients were given the opportunity to list some of the items they had not yet repaired. Group members discussed the need to continue to repair relationships, stop using drugs as a crutch when emotions such as anger or fear take over, repair overall health, begin to care for one's self, working on mental health, working on one's own attitude, repairing financial status and credit, etc.

Plan: Group members were thanked for their work and feedback in this exercise. Group facilitator encouraged client to keep transforming their life and make the necessary repairs in life.

J.A. 82–83. Although this medical record provides specific details, including direct quotations of patient responses, it kept appearing in other patient files that Wheeler observed. On March 3, 2021, a medical record of "sidewalk group" therapy for a different patient contained nearly verbatim language, omitting only the words "Assessment" and "Plan." J.A. 83–84. An identical note was found in the files of another patient on March 4, 2021, and in the file of yet another patient on March 5, 2021. It was even reused a second time for Patient 1. Wheeler alleges that none of those therapy sessions actually took place.

Yet another patient, who Wheeler called "Patient 6," was enrolled in both Medicare and Medicaid. Patient 6 received methadone-assisted treatment at Acadia's Asheville clinic

9

beginning in April 2020. His initial treatment plan required that he participate in counseling. For well over a year, however, Acadia failed to provide him with that option. In July 2021, Patient 6 met with a counselor to update his treatment plan. At that time, Patient 6 had failed two previous drug screenings, reported that he was struggling to remain sober, and expressed interest in group therapy. His treatment plan was updated to indicate that he would "continue to attend counseling sessions through telehealth or in person sessions" and to note that Patient 6 "could benefit from attending group [therapy] as well." J.A. 99. Despite the fact that his treatment plan called for group therapy, Patient 6 never received such therapy up to the time Wheeler left Acadia in December 2021.

Patient 6's medical record told another story. His record contained several group therapy notes suggesting that he participated in group therapy often. At least four notes indicating that Patient 6 participated in group therapy were *exact* duplicates of notes used previously for other patients. In one instance, Patient 6's record stated that he was part of a "continuous lobby group" session held on April 7, 2021. The record of that event contains an 800-plus word account of the session and includes details as specific as "one client on the line stated he goes for walks and leaves his phone at home just 'to get away from the noise.'" J.A. 96–97. That note was an *exact* duplicate of the note that Acadia used for Patient 1 on January 29, 2021. It was also the same note that was used for seven other patients on six different days. The details about this "impromptu *lobby* group" suggested that the group was convened by teleconference, but the Asheville clinic lacked the technical capability to conduct telehealth meetings.

10

Wheeler also observed that individual, non-contact therapy notes were falsified during the COVID-19 pandemic. During this period, Acadia began making brief calls to patients but recorded the calls as full therapy sessions. Acadia provided no meaningful individual therapy to its patients during that time but created records suggesting that therapy occurred. In sum, Acadia provided insufficient individual therapy and no group therapy, but it billed government healthcare programs as if such services had been provided.

Wheeler attempted to raise her concerns with her supervisors on many occasions. In March, May, and July of 2021, Wheeler informed the Clinic Director of the Asheville facility that Acadia was engaging in fraud by falsifying group therapy records. Acadia never investigated her reports. Instead, after becoming aware of Wheeler's complaints, Acadia's Regional Director for North Carolina ordered the Clinic Director of the Asheville facility to tell Wheeler to "stay in her lane." J.A. 93.

## C.

This is not the first time Acadia has faced allegations of fraud. In April 2014, the Department of Justice announced the settlement of FCA claims against an Acadia affiliate's predecessor related to allegations that it "knowingly submitted false claims by providing substandard treatment to adult and adolescent Medicaid patients suffering from alcohol and drug addiction." J.A. 65. In May 2019, the Department of Justice announced another settlement with Acadia. That claim related to Acadia's treatment centers seeking Medicaid reimbursement for moderate and high complexity laboratory drug testing which Acadia's facilities "were not certified to perform, and did not, in fact, perform." J.A. 66.

11

Medicaid unwittingly paid Acadia's treatment centers $8,500,000 for those false tests. J.A. 67.

As a condition of the 2019 settlement, Acadia entered into a corporate integrity agreement (CIA) with the United States Department of Health and Human Services (HHS), which Wheeler attached to her complaint. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) ("In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint."). The CIA required Acadia to provide training to certain "covered persons," including staff, contractors, and agents who provide patient care or perform a billing or coding function. J.A. 124–25, 129–30. These covered persons were required to receive at least annual trainings on the requirements of federal healthcare programs and the requirements of the CIA itself. J.A. 129–30.

The CIA also required Acadia to develop a "disclosure program" that would enable individuals to internally report any potential concerns about Acadia's policies, conduct, practices, or procedures with respect to a federal health care program believed by the individual to be a potential violation of criminal, civil, or administrative law. J.A. 131. The CIA further required Acadia to publicize the existence of this disclosure program to its employees. J.A. 131–32.

Under the CIA, Acadia was required to mandate that covered persons "report suspected violations of any Federal health care program requirements." J.A. 132. Upon receipt of any such disclosure, Acadia was to gather information about the report. J.A. 132. If, "after a reasonable opportunity to conduct an appropriate review or investigation of the

12

allegations," Acadia determined that there had been an overpayment, or "a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program," Acadia was to notify the HHS Office of the Inspector General. J.A. 135.

Wheeler alleges that Acadia never provided her or other staff the annual trainings required by the CIA, and Acadia never made her aware of a disclosure program. As we noted, Wheeler reported the false group therapy records to the Asheville Clinic Director multiple times between March and July 2021. Yet Acadia failed to investigate, take remedial action, or report to the HHS Office of the Inspector General any information Wheeler brought forward.

## II. Procedural History

On September 10, 2021, Wheeler filed this case against Acadia under seal, as is required by the False Claims Act, on behalf of the United States of America and the State of North Carolina. The United States of America and the State of North Carolina declined to intervene in June 2022, and subsequently the complaint was unsealed. In August 2022, Wheeler filed an amended complaint, which alleges six separate False Claims Act violations by Acadia:

- Count I: a claim of "presentment" under 31 U.S.C. § 3729(a)(1)(A);

- Count II: a claim of "false statement" under Section 3729(a)(1)(B);

- Count III: a claim of "conversion" under Section 3729(a)(1)(D);

- Count IV: a claim of "false certification" under Section 3729(a)(1)(B);

13

- Count V: a claim of "fraudulent inducement" under Section 3729(a)(1)(B); and

- Count VI: a "reverse false claim" under Section 3729(a)(1)(G).

Wheeler's reverse false claim relates only to Acadia's alleged violations of the CIA.

Wheeler also brought a claim under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq*. The North Carolina False Claims Act "largely parallels the False Claims Act and is interpreted consistent with it." *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 179 n.2 (4th Cir. 2022) (citing N.C. Gen. Stat. § 1-616(c)). Accordingly, we "discuss only the [federal] False Claims Act, although our analysis and conclusions apply equally" to Wheeler's North Carolina False Claims Act claim. *See id.*

After Wheeler filed her amended complaint, Acadia moved to dismiss. The district court referred Acadia's motion to a magistrate judge for review. In evaluating Acadia's motion to dismiss, the magistrate judge considered Wheeler's claims in three groups: the four claims under 31 U.S.C. § 3729(a)(1)(A) and (B) (Counts I, II, IV, and V); the conversion claim (Count III), and the reverse false claim (Count VI). *Wheeler v. Acadia Healthcare Co.*, No. 1:21-cv-00241-MR-WCM, 2023 WL 6035712, at *6, *10–12 (W.D.N.C. July 27, 2023). Wheeler has abandoned her conversion claim, Count III, on appeal.

The magistrate judge first determined that Wheeler failed to allege with sufficient specificity that the practices she became aware of in Acadia's Asheville, North Wilkesboro, Pinehurst, and Fayetteville facilities were occurring at any other facilities. *Id.* at *7. The magistrate judge found insufficient that Wheeler relied only upon a belief that Acadia had

14

a corporate policy to falsify medical records. *Id.* Thus, the magistrate judge recommended that the district court dismiss Wheeler's claims as they relate to any clinics other than these four North Carolina facilities. *See id.*

After limiting the scope of Wheeler's claims under 31 U.S.C. § 3729(a)(1)(A) and (B), the magistrate judge next concluded that Wheeler had failed to adequately plead that Acadia's allegedly false claims were material or submitted to the government, two requirements of an FCA claim. *Wheeler*, 2023 WL 6035712, at *7–10. The magistrate judge concluded that Wheeler failed to meet the materiality requirement because her claims relied solely on general compliance with applicable laws and regulations, rather than demonstrating that Acadia's failure to provide therapy was "material to any Government Healthcare Program's payment decisions." *Id.* at *8. The magistrate judge then determined that Wheeler had failed to demonstrate that the false claims were submitted to the government. *Id.* at *9–10. According to the magistrate judge, Medicare did not require Acadia to provide therapy in order to bill for weekly payments, so Acadia had not submitted any false statements to the Medicare program. *Id.* at *10. With respect to the healthcare programs that bill for individual services, such as Medicaid, the magistrate judge concluded that Wheeler's amended complaint lacked specific allegations that Acadia submitted any bills to those programs. *Id.* at *10.

The magistrate judge then turned to Wheeler's reverse false claim. Noting a split within the federal district courts as to whether stipulated monetary penalties can constitute an "obligation" under the False Claims Act, the magistrate judge concluded that the

15

stipulated penalties in the CIA are not an "obligation" because they rely upon the government choosing to enforce the penalty. *Id.* at *12–13.

The magistrate judge provided a report to the district court recommending dismissal of all of Wheeler's claims. The district court adopted the magistrate judge's recommendation in full. *Wheeler v. Acadia Healthcare Co.*, No. 1:21-cv-00241-MR-WCM, 2023 WL 6060344, at *2 (W.D.N.C. Sept. 18, 2023).

## III. Standard of Review

We review *de novo* a district court's grant of a motion to dismiss for failure to state a claim, construing "factual allegations in the light most favorable" to the plaintiff. *United States v. Walgreen Co.*, 78 F.4th 87, 92 (4th Cir. 2023).

Wheeler's claims, like all claims arising under Sections 3729(a)(1)(A) and (B) of the False Claims Act, are based on allegations of fraud and must, therefore, satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455–56 (4th Cir. 2013). "Rule 9(b) requires a plaintiff alleging fraud or mistake, like a False Claims Act [whistleblower], to 'state with particularity the circumstances constituting fraud or mistake,' though knowledge 'may be alleged generally.'" *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting Fed. R. Civ. P. 9(b)). "These circumstances are often 'referred to as the 'who, what, when, where, and how' of the alleged fraud.'" *Id.* (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008)).

16

IV. Analysis

We evaluate this appeal in two parts. We first consider Wheeler's FCA claims of presentment, false statement, false certification, and fraudulent inducement. We then turn to Wheeler's "reverse false claim" that Acadia's CIA violations resulted in obligations it has failed to pay the government.

A. Waiver

Before we can address the merits of this appeal, however, we must consider as a threshold matter Acadia's contention that Wheeler waived her claims of false certification and fraudulent inducement. Acadia argues that Wheeler, in her objection to the magistrate judge's recommendation, failed to provide a "substantive explanation" why dismissal of those claims would be improper. Acadia Br. at 8–12. That is not our standard for objections to a magistrate judge's recommendation. Wheeler objected with the specificity this court requires.

The Federal Magistrates Act, 28 U.S.C. § 636(b)(1), requires district courts to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Osmon v. United States*, 66 F.4th 144, 146 (4th Cir. 2023). "[A] party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007). Failure to object with sufficient specificity "waives a right to appellate review." *Id.* at 621.

17

The specificity required for an objection is a "modest bar." *Osmon*, 66 F.4th at 146. In *Osmon*, this court explained that "the statute requires an 'objection' rather than a freestanding brief or memorandum of law, and a party *need not frame its arguments anew when it objects*." *Id.* at 146–47 (emphasis added). Wheeler easily cleared that modest bar.

The magistrate judge's report and recommendation grouped the fraudulent inducement, false certification, presentment, and false statement claims and considered these claims together because they require similar elements of proof. *Wheeler*, 2023 WL 6035712, at *6. After the magistrate judge's recommendation issued, Wheeler objected to the dismissal of each of these claims individually. That alone was sufficient to preserve her claims before the district court and to meet our "modest bar" for an objection following a magistrate judge's findings and recommendation. Wheeler thus did not waive her false certification and fraudulent inducement claims.

## B. False Claims

We next turn to Wheeler's FCA claims under 31 U.S.C. § 3729(a)(1)(A) and 3729(a)(1)(B). Count I of Wheeler's complaint sets forth a presentment claim pursuant to 31 U.S.C. § 3729(a)(1)(A), which provides that "any person who [. . .] knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [. . .] is liable to the United States Government." Counts II, IV, and V set forth Wheeler's false statement, false certification, and fraudulent inducement claims, respectively. Each of these claims is brought under 31 U.S.C. § 3729(a)(1)(B), which provides that "any person who [. . .] knowingly makes, uses, or causes to be made or used, a false record or

18

statement material to a false or fraudulent claim [. . .] is liable to the United States Government."

Wheeler's presentment claim alleges that Acadia knowingly submitted a false claim to the government. *See United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 193 (4th Cir. 2022). Her false statement claim alleges that Acadia knowingly made a false statement or produced a false record that was submitted to the government by someone else. *See id.* Wheeler asserts these causes of action with respect to claims Acadia submitted to the Medicaid, TRICARE, and the Veterans Health Administration healthcare programs, all of which pay for opioid treatment services on a fee-for-service basis.

Wheeler's false certification and fraudulent inducement claims operate somewhat differently. A false certification claim presumes that the defendant *implicitly* certified that it complied with relevant statutes, regulations, or contract requirements when it knew that it was not complying. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 176 (2016). A fraudulent inducement claim is based on the theory that the defendant obtained participation in the government program through fraud. *United States v. Strock*, 982 F.3d 51, 60 (2d Cir. 2020). Wheeler brings these causes of action with respect to the claims for payment Acadia submitted to Medicare, which bills using weekly bundled payments.

For Wheeler's presentment, false statement, false certification, and fraudulent inducement claims to survive a motion to dismiss, she must allege four elements: 1) that Acadia made a false statement or engaged in a fraudulent course of conduct; 2) such

19

statement or conduct was made or carried out with the requisite scienter;[2] 3) the statement or conduct was material; and 4) the statement or conduct "caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')."[3] *Taylor*, 39 F.4th at 188 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999)). "Failure to adequately allege any of these elements dooms a claim." *Id.* In evaluating whether Wheeler's allegations meet these elements, we will consider her claims as a group unless noted otherwise.

### i. Falsity

In drafting the False Claims Act, "Congress did not define what makes a claim 'false' or 'fraudulent.'" *Taylor*, 39 F.4th at 200 (quoting *Escobar*, 579 U.S. at 187). Thus, this court has relied on the well-settled meaning of the common law terms used in the statute. *Id.* "At common law, a false statement encompassed any 'words or conduct' that 'amount[ ] to an assertion not in accordance with the truth.'" *Id.* (alteration in original) (quoting Restatement (Second) of Torts § 525 cmt. b (1977)). This includes a "representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying [information]." *Id.* at 188 (quoting Restatement (Second) of Torts § 529).

---

[2] Scienter is undisputed. Thus, we do not discuss this element.

[3] This court has not determined whether submission of a false claim is an element of a false certification or fraudulent inducement claim. *See Taylor,* 39 F.4th at 195 n.12. Wheeler argues only that her claims meet the submission requirement, however. Therefore, we assume without deciding that she must adequately plead that element for both her false certification and fraudulent inducement claims.

Wheeler's complaint readily meets this broad definition with respect to Acadia's North Carolina facilities. Wheeler pleads detailed allegations that Acadia created notes for therapy sessions that did not actually occur, even going so far as to falsify specific case notes that were reused on different dates for different patients. These allegedly false notes would constitute misrepresentations about the services Acadia provided under government healthcare programs. Wheeler further alleges that these notes evidenced Acadia's noncompliance with statutory and regulatory requirements for OTPs.

Wheeler's allegations that Acadia falsified notes relate predominantly to her observations at the Asheville clinic. Wheeler also alleges that the Medical Director of the North Wilkesboro, North Carolina clinic informed her that group therapy notes were similarly falsified at that clinic. When Wheeler complained about the misconduct she had observed, the Clinic Director of the Asheville facility informed her that the fraudulent group therapy notes were being created "at other North Carolina locations," including the clinics in Pinehurst and Fayetteville. J.A. 92–93. Just after Wheeler registered that complaint, the manager responsible for Acadia's North Carolina oversight told Wheeler to "stay in her lane." J.A. 93. These allegations are sufficient evidence that Acadia made fraudulent representations about its compliance with statutory and regulatory requirements across Acadia's North Carolina opioid use disorder treatment clinics. We depart from the district court's conclusion that Wheeler's allegations sufficiently allege falsity only for four of Acadia's North Carolina facilities, because the Clinic Director informed her that fraudulent group therapy notes were used at Acadia's facilities across North Carolina.

21

While Wheeler met her pleading requirement with respect to Acadia's North Carolina clinics, she failed to allege with sufficient particularity that any facilities outside of North Carolina were falsifying group therapy notes. Wheeler's complaint attempts to reach Acadia's nationwide clinics through her allegations that the practice of falsifying group therapy notes is "corporate policy." J.A. 104–05. A mere allegation that a corporate policy exists, with nothing more, is insufficient. Rule 9(b) requires a False Claims Act whistleblower to describe the fraud with sufficient particularity. *Nicholson*, 42 F.4th at 195. Our standard for False Claims Act pleadings requires that Wheeler have "substantial prediscovery evidence of th[e] facts." *Harrison*, 176 F.3d at 784. Nothing in Wheeler's complaint allows us to infer that the alleged "corporate policy" in fact exists. Thus, we conclude that Wheeler's allegations meet the pleading requirement only with regard to Acadia's North Carolina clinics.

### ii. Materiality

Alleging a misrepresentation will not, without more, suffice to meet the pleading requirement under the False Claims Act. "A misrepresentation about compliance with a statutory, regulatory, or contractual requirement *must be material to the Government's payment decision* in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 181 (emphasis added). For purposes of the False Claims Act, materiality means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In *Escobar*, the Supreme Court described this "rigorous" requirement. 579 U.S. at 181. We turn to *Escobar* to guide our analysis.

22

In *Escobar*, the Supreme Court looked to common law principles to explain that the materiality inquiry should focus on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 193 (quoting 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)). A matter is material in tort law if "a reasonable man would attach importance to [it] in determining his choice of action in the transaction," or if there was reason to know "that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not." *Id.* (quoting Restatement (Second) of Torts § 538, at 80). In order to meet the materiality requirement, the fraud alleged under the False Claims Act must be "so central to" the purpose of the government contract that the government "would not have paid the[ ] claims had it known of the[ ] violations." *Id.* at 196.

The Court explained that some express conditions of payment might be "relevant, but not automatically dispositive" of materiality. *Id.* at 194. If, for example, "the Government contracts for health services and adds a requirement that contractors buy American-made staplers, anyone who submits a claim for those services but fails to disclose its use of foreign staplers" would not be in violation of the False Claims Act. *Id.* at 195. The failure to follow a "minor or insubstantial" requirement, such as purchasing American-made staplers, does not suffice to show materiality. *Id.* at 194.

1.

This court has considered the materiality of an FCA claim in three cases post-*Escobar*: *United States ex rel. Badr v. Triple Canopy, Inc.*, 857 F.3d 174 (4th Cir. 2017); *United States ex rel. Taylor v. Boyko*, 39 F.4th 177; and *United States v. Walgreen*

23

*Company*, 78 F.4th 87. These cases help establish the framework for determining whether a claim is material.

In two of these cases, *Triple Canopy* and *Walgreen Company*, this court held the claims were material. In *Triple Canopy*, the government awarded Triple Canopy, a private military security company, a one-year contract to provide security services at Al-Asad Airbase in Iraq. 857 F.3d at 175. As part of that contract, Triple Canopy was required to meet certain "responsibilities," including ensuring that all employees adequately completed "a U.S. Army qualification course." *Id.* An FCA whistleblower alleged that Triple Canopy employed guards who did not meet the qualification course's marksmanship requirement. *Id.* Rather than inform the government of this deficiency, the FCA whistleblower alleged that Triple Canopy falsified the guard's marksmanship scorecards. *Id.* This court found Triple Canopy's alleged omissions material for two reasons: "common sense and Triple Canopy's own actions in covering up the noncompliance." *Id.* at 178. It was plain that the marksmanship requirement was a "precondition for payment." *Id.* at 178 n.4. The government certainly would not pay for "guards that cannot shoot straight" when the contract called for proof of adequate marksmanship. *Id.* at 177. Although Triple Canopy did not certify contractual compliance in its invoices, the government would not have paid Triple Canopy but for the marksmanship falsification. *Id.* at 177–79.

This court similarly found the claims material in *Walgreen Company*. There, an FCA whistleblower alleged that Walgreens, to prescribe more medication and increase profits, falsified patient compliance with Virginia's Hepatitis C medicine eligibility requirements. *Walgreen Co.,* 78 F.4th at 89–90. Walgreens allegedly submitted false

24

patient records that overstated the severity of patients' symptoms. Walgreens also allegedly falsified records concerning patient compliance with drug abstinence requirements. *Id.* at 90. This court reasoned that Walgreens's misrepresentations had "a natural tendency to influence, or [were] capable of influencing," the government decisionmakers. *Id.* at 93 (quoting 31 U.S.C. § 3729(b)(4) (brackets in original)). "In fact, they *did* influence the decisionmakers" because Virginia had rejected claims when patients suffered less severe symptoms or had failed to meet drug screens. *Id.*

*Taylor*, by contrast, provides an example of a claim that failed to adequately allege the requisite materiality. In *Taylor*, an FCA whistleblower alleged that a healthcare staffing company submitted false claims to Medicare by failing to maintain its certificate of corporate authorization with the state of West Virginia. 39 F.4th at 192–93. This court upheld dismissal of that claim because the complaint failed to allege how the staffing company's loss of its certificate of corporate authorization—from its neglecting to file an annual report and pay a $25 fee—would impact government decisionmaking on claims for healthcare payments. *Id.* at 191, 202. The complaint in *Taylor* alleged that the government rejected claims by *individual* healthcare providers who had lost their *personal* medical licenses and analogized that to the lack of a corporate certificate. *Id.* at 191. This court recognized, however, that personal medical licenses are quite different than state certificates of corporate authorization. *Id.* While an individual doctor's license is "so central" to the medical services provided that the "Medica[re] program would not have paid these claims had it known of these violations," it was not clear from Taylor's allegations that a state certificate of corporate authorization would be so central to

Medicare payment. *Id.* at 193 (quoting *Escobar*, 579 U.S. at 196). Although the FCA whistleblower in *Taylor* adequately alleged that the staffing company violated state law by failing to maintain corporate authorization, there was no reason to infer that the federal government would decline to pay the Medicare claims as a result.

2.

Wheeler sufficiently alleges materiality under the rule established in *Escobar* and this court's subsequent precedent. Put simply, compliance with federal methadone-assisted treatment regulations is "so central" to Acadia's methadone-assisted treatment that the government would not have paid the claims had it been aware of the violations. *Escobar*, 579 U.S. at 196. Unlike the requirements that were found to be immaterial in *Escobar* and *Taylor*, OTPs are required to provide adequate substance use disorder counseling in order to obtain authorization to participate in government healthcare programs and remain in compliance. 42 C.F.R. § 8.12(f)(1). Falsifying patient records to government healthcare programs is not akin to failing to purchase American staplers, *see Escobar*, 579 U.S. at 194–95, or failing to maintain a certificate of corporate authorization with the state, *Taylor*, 39 F.4th at 192–93.

Clinics that fail to provide counseling services are precluded from providing methadone or seeking SAMHSA certification. *See* 42 C.F.R. § 8.12(a), (f)(5)(i). Whether Acadia provides adequate therapy determines if it can provide methadone-assisted treatment *at all*. It is thus "common sense" that the government would not pay Acadia to provide methadone-assisted treatment unless it was in compliance with core methadone-assisted treatment regulations. *See Triple Canopy, Inc.*, 857 F.3d at 178.

26

Acadia also contends that the requirement to comply with federal opioid treatment standards meant nothing more than general "compliance with applicable laws and regulations." Acadia Br. at 28–29 (quoting *Wheeler*, 2023 WL 6035712, at *8). Acadia argues such generalized compliance with federal law was immaterial to receiving government healthcare payments because Acadia had previously been certified to provide methadone-assisted treatment. *Id.* That argument fails to reconcile the compliance requirements for OTPs and the commonsense connection between Acadia's claims for methadone assisted treatment and violations of the very laws that allow it to provide such treatment. Acadia was under an ongoing obligation to comply with the federal opioid treatment standards. 42 C.F.R. § 8.12(a) (stating that "OTPs must provide treatment in accordance with the standards in this section"). Moreover, omissions that "fall squarely within the rule that half-truths—representations that state the truth only so far as it goes, while omitting *critical qualifying information*—can be actionable misrepresentations." *Escobar,* 579 U.S. at 188 (emphasis added). Acadia did not simply omit qualifying information, it falsified it.

As this court recognized in *Walgreen Company* and *Triple Canopy*, "the very act of falsifying records to feign compliance with requirements suggests that [the company] itself thought that those requirements were material." *Walgreen Co.*, 78 F.4th at 94; *see also United States ex rel. Badr v. Triple Canopy, Inc.*, 775 F.3d 628, 638 (4th Cir. 2015). Wheeler alleges that Acadia actively falsified therapy records to fraudulently indicate compliance with federal regulatory requirements in order to receive payments under government healthcare programs. Acadia would not have orchestrated a scheme to falsify

27

medical records had it truly believed that group therapy was immaterial to the government's decision to pay.

Wheeler sufficiently pleads facts that, if true, would establish that the government would not have paid Acadia's claims had it known Acadia was not providing group therapy or adequate individual therapy. Wheeler therefore adequately pled materiality.

### iii.      Submission of a False Claim

The final element for Wheeler's claims requires that the fraudulent statement or conduct "caused the government to pay out money or to forfeit moneys due." *Taylor*, 39 F.4th at 188. Fraud is actionable under the False Claims Act only if it constitutes a "false or fraudulent *claim*." *Nathan*, 707 F.3d at 454 (quotation omitted) (emphasis in original).

A plaintiff can establish submission of a false claim in one of two ways. A plaintiff can "allege with particularity that specific false claims actually were presented to the government for payment." *Id.* at 457. This standard requires the plaintiff to, "at a minimum, describe 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Id.* at 455–56 (quoting *Wilson*, 525 F.3d at 379). Alternatively, a plaintiff can allege that the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were submitted to the government. *Id*. at 456.

This court has considered the submission of false claims in two cases since Congress amended the False Claims Act in 2009: *United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc.,* 707 F.3d 451, and *United States ex rel. Grant v.*

28

*United Airlines Inc.*, 912 F.3d 190 (4th Cir. 2018). In each case, this court found that the FCA whistleblower alleged fraud but failed to connect the fraud to a government payment.

In *Grant*, an FCA whistleblower alleged that United Airlines did not possess an "FPI radiometer," a necessary tool for certain repairs required for federal maintenance of aircraft. 912 F.3d at 95. United Airlines nevertheless continued to sign off on documentation indicating that it had completed repairs and inspections that should have required the use of a radiometer. *Id.* This court found that the complaint failed to allege facts that connected the payments to the fraudulent activity: "[T]he complaint lacks any allegation—for instance, that upon information and belief, bills are routinely sent to the government upon completion of repairs and are routinely paid as presented—that fills that gap." *Id.* at 199. The complaint left open the possibility that the government was never billed for the allegedly fraudulent repairs, and failed to demonstrate that the repairs did not in fact occur. *Id.* This court also emphasized that United Airlines was three levels removed from the government in the subcontracting relationship and distinguished *Grant* from those cases in which "the defendant contracted *directly* with the government, and the complaint provided at least some explanation of the billing structure." *Id*. at 198. Thus, this court affirmed the dismissal of Grant's complaint because he failed to sufficiently allege that a false claim was submitted to the government.

Similarly, in *Nathan*, this court affirmed a motion to dismiss an FCA claim because the complaint likewise failed to demonstrate submission of a false claim. Nathan, an FCA whistleblower, alleged that his former employer, Takeda Pharmaceuticals, provided drug prescriptions for "off-label" uses not approved by the Food and Drug Administration.

29

*Nathan*, 707 F.3d at 454. Nathan alleged that federal health insurance programs did not reimburse for these off-label uses. *Id.* He claimed that, because the cost of prescriptions for off-label uses is not subject to reimbursement by the federal government, the submission of these types of claims for payment violated the False Claims Act. *Id.*

This court was not "persuaded by [Nathan's] contention that allegations of a fraudulent scheme, in the absence of an assertion that a specific false claim was presented to the government for payment, is a sufficient basis on which to plead a claim under the [FCA] in compliance with Rule 9(b)." *Id.* at 456. Instead, "the critical question is whether the defendant caused a false claim to be presented to the government, because liability under the [FCA] attaches only to a claim actually presented to the government for payment, not to the underlying fraudulent scheme." *Id.* In *Nathan*, this court contrasted these allegations to those in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009), where the Fifth Circuit held that the FCA whistleblower adequately alleged submission of a false claim. *Nathan*, 707 F.3d at 454. The reasoning in *Grubbs* proves applicable here.

In *Grubbs*, the whistleblower alleged a conspiracy by doctors to seek reimbursement from government healthcare programs for services that had not been performed. 565 F.3d at 184. The Fifth Circuit reasoned that, because the complaint included allegations of specific services recorded but never provided, such allegations constituted "more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government." *Id.* at 192. The Fifth Circuit thus concluded that it would "stretch the

30

imagination" for the doctors to continually record services that were not provided, but "to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed." *Id.; see also United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.,* 579 F.3d 13, 30–32 (1st Cir. 2009) (holding that, in a scheme alleging kickbacks to health care providers, allegations of "the dates and amounts of the false claims filed by these providers with the Medicare program" met the standard imposed by Rule 9(b)).

Like the allegations in *Grubbs*, Wheeler's allegations meet Rule 9(b)'s standard for submission of false claims. Acadia argues that Wheeler failed to allege that the fraudulent therapy notes were submitted in actual claims for payment. Yet an FCA whistleblower need not "produce documentation or invoices at the outset of the suit," nor are they required to have "specific knowledge of a company's financial and billing structure." *Grant*, 912 F.3d at 199. If an FCA whistleblower "cannot allege the details of an actually submitted false claim, [the complaint] may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190. This court requires only "that plaintiffs connect the dots, even if unsupported by precise documentation, between the alleged false claims and government payment." *Grant*, 912 F.3d at 199. Wheeler adequately connects the dots.

Wheeler provides multiple examples of false therapy notes that were repeatedly used to falsify patient records, identifying Acadia staff who created and signed the notes, and specifying the dates and descriptions of the fictitious therapy sessions. She further

31

describes the use of fraudulent "bibliotherapy" worksheets to create the impression that therapy had been provided. There can be little doubt that, if Acadia created these false notes, it billed for those services. It would "stretch the imagination" for Acadia's practitioners continually to record services that were not provided, but "to deviate from the regular billing track at the last moment so that the recorded, but unprovided, services never get billed." *See Nathan*, 707 F.3d at 454 (quoting *Grubbs*, 565 F.3d at 192). Unlike the FCA whistleblower in *Grant*, Wheeler alleges that Acadia contracted directly with the government and sought reimbursement directly from government healthcare programs, which Wheeler explained in depth. Wheeler's allegations suffice to connect Acadia's allegedly submitted false claims for payment from Medicaid, TRICARE, and the Veterans Health Administration, which each pay for opioid treatment services on a fee-for-service basis. Wheeler therefore adequately pled submission of false claims for her presentment and false statement claims.

Wheeler's claims concerning payments under Medicare differ because Medicare's billing procedure differs. To establish submission of false claims to Medicare, Wheeler alleges implied false certification and fraudulent inducement. Rather than alleging that individual claims were fraudulent, Wheeler alleges that Acadia fraudulently certified that it had complied with federal regulations and thereby fraudulently induced the government to allow Acadia to participate in government healthcare programs.

Acadia argues that Wheeler's false certification and fraudulent inducement claims fail because Medicare's bundled billing procedure does not require an OTP to provide therapy in any given week. According to Acadia, Wheeler cannot demonstrate that any

32

specific claim Acadia presented to Medicare violated the federal opioid treatment standards. *Id.* While it is true that Medicare only requires an OTP to provide one type of service each week, and that such service may include methadone distribution, the claims Acadia submitted to Medicare were implicitly false because they falsely certified compliance with federal opioid treatment standards and fraudulently induced the government to continue Acadia's SAMHSA accreditation.

When Medicare receives a claim under a bundled billing code, a core assumption behind allowing payment is that the entity has provided the full suite of federally mandated services. "The bundled payment for episodes of care in which a medication is provided consists of payment for a drug component, reflecting payment for the applicable FDA-approved opioid [. . .] medication in the patient's treatment plan, *and a non-drug component*, reflecting payment for all other opioid use disorder treatment services reflected in the patient's treatment plan." 42 C.F.R. § 410.67(d)(2) (emphasis added). All bundled codes for Medicare contain a non-drug component, which is based on the sum of:

> (1) *Psychotherapy, 30 minutes with patient*
> (2) *Group psychotherapy*
> (3) Alcohol and/or substance (other than tobacco) abuse structured assessment and brief intervention at the non-physician practitioner rate.
> (4) For administration of an injectable medication, if applicable, drug administration (Therapeutic, prophylactic).
> (5) For the insertion, removal, or insertion and removal of the implantable medication, if applicable, the applicable rate.

*Id.* § 410.67(d)(2)(ii) (emphasis added). The non-drug component is often more costly than the drug component in Medicare's billing schemes.

33

Wheeler alleges that Acadia submitted implicitly false claims to Medicare by certifying that it had provided the appropriate weekly non-drug services to its patients in accordance with each patient's treatment plan. *See* 42 C.F.R. § 8.12(f) (listing counseling services as a "[r]equired service[ ]" and requiring OTPs to "provide adequate substance use disorder counseling and psychoeducation to each patient as clinically necessary"). Acadia was not required to provide every service each week, or even provide counseling in any given week. Bundled billing codes allow for flexibility in when services are provided. Even with this flexibility, however, the codes assume all critical services will be provided and will be made available to the patient. If the only service that Acadia provided its patients was methadone distribution, as Wheeler alleges, then Acadia was in fact ineligible to receive payment through Medicare's bundled billing scheme. Upon review of Acadia's invoices, the government "would probably—but wrongly—conclude that [Acadia] had complied with core requirements" of the federal opioid treatment standards. *See Triple Canopy, Inc.*, 857 F.3d at 178. Thus, we conclude that Wheeler plausibly alleges Acadia submitted claims that falsely certified compliance with federal regulations.

We similarly find sufficient Wheeler's allegations that Acadia fraudulently induced the government to provide Acadia the benefits of OTP accreditation, including by giving it renewed SAMHSA certification. To adequately plead a claim of fraudulent inducement, Wheeler need only allege facts that, if true, would demonstrate that Acadia misrepresented its compliance with a condition of payment to induce the government to enter or renew the contract. *See United States v. Molina Healthcare of Illinois, Inc.*, 17 F.4th 732, 741 (7th Cir. 2021).

34

By allegedly creating false therapy notes and submitting claims to Medicare, Wheeler alleges Acadia represented that it complied with federal opioid standards even though it had not. She further alleges that Acadia created the false notes to demonstrate compliance with the federal opioid treatment standards that expressly require each patient be provided counseling services. 42 C.F.R. § 8.12(f)(1). In doing so, Wheeler alleges, Acadia fraudulently induced the government to allow it to provide services under government healthcare programs in which it would not otherwise have been permitted to participate. *See* 42 C.F.R. § 8.11(b)(6), (e)(7) (requiring OTPs to agree to "operate in accordance with Federal opioid treatment standards and approved accreditation elements"). Although Acadia would have been aware that it failed to meet a SAMHSA requirement, Wheeler alleges Acadia nonetheless requested continued SAMHSA accreditation based on its fraudulent records and continued to submit claims to the government for payment through Medicare. Wheeler alleges that SAMHSA re-accreditation is required every three years. Because she also alleges that the falsification of group therapy notes began in September 2020 and remains ongoing, the complaint adequately alleges that Acadia facilities necessarily sought and obtained SAMHSA re-accreditation during the period in which group therapy notes were allegedly being forged. These allegations, if true, would support a claim of fraudulent inducement.

Wheeler's allegations suffice to demonstrate the required elements for her claims of presentment, false statement, false certification, and fraudulent inducement—Counts I, II, IV, and V of her amended complaint.

35

C. Reverse False Claim

We last turn to Wheeler's reverse false claim. A reverse false claim flips the typical claim under the False Claims Act: "Direct false claims cause the United States to remit money directly to claimants, whereas reverse false claims facilitate the improper withholding of money or property to which the United States is legally entitled." *United States ex rel. Landis v. Tailwind Sports Corp.*, 160 F. Supp. 3d 253, 255 (D.D.C. 2016). This court has not considered a reverse false claim since Congress amended the False Claims Act in 2009.

A company may be held liable for a reverse false claim if it: (1) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an *obligation to pay* or transmit money or property to the Government;" or (2) "knowingly conceals or knowingly and improperly avoids or decreases an *obligation to pay* or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G) (emphasis added). The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

We begin this inquiry by examining the terms of the CIA between Acadia and the government and determining whether Wheeler's allegations, if true, would constitute a violation of that agreement. Wheeler alleges two potential violations: First, she alleges that Acadia failed to provide the requisite training or inform her of the CIA's disclosure program. These allegations could constitute violations of the CIA. Wheeler was a "covered

36

person" under the terms of the CIA, because she worked for Acadia providing patient care. J.A. 124–25. Acadia was, therefore, required to provide her with trainings at least annually on the requirements of the federal healthcare program and the CIA. J.A. 129–30. The CIA also required Acadia to publicize the existence of the disclosure program to Wheeler and all other covered persons. J.A. 131–32.

Second, Wheeler alleges that she reported the false group therapy records to her superiors, including the Asheville Clinic Director, multiple times between March and July 2021. Wheeler alleges that Acadia failed to investigate, take remedial action, or report any of Wheeler's information to the HHS Office of the Inspector General. This failure to investigate, if true, would also constitute a violation of the CIA. Upon receipt of any disclosure believed by the individual to be "a potential violation of criminal, civil, or administrative law," that would "permit[ ] a determination of the appropriateness of the alleged improper practice," and "provide[ ] an opportunity for taking corrective action," the terms of the CIA required Acadia to conduct an internal review. J.A. 131–32. If upon review Acadia determined that there had been an overpayment, or "a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program," it was required, under the terms of the CIA, to notify the HHS Office of the Inspector General of the violation. J.A. 135. Wheeler sufficiently alleges such violations went unreported.

Next, we consider whether these alleged violations would create an "obligation" owed by Acadia to the government. 31 U.S.C. § 3729(a)(1)(G). This inquiry similarly requires us to look to the terms of the CIA. The CIA contained a provision, in addition to

37

any remedies independently available under federal or state law, for stipulated monetary penalties in the event of breach. J.A. 145–47. The CIA required Acadia to pay $2,500 for each day it failed to establish, implement, or comply with requirements for "training and education of Covered Persons," the "Disclosure Program," or "reporting of Reportable Events." J.A. 145. The CIA further defined a "Reportable Event" as "(a) a substantial overpayment; [or] (b) a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program." J.A. 135.

Acadia argues that these stipulated penalties are not an "obligation," because they were contingent and may not ultimately materialize. We disagree. Taking Wheeler's allegations as true, the stipulated penalties have accrued.

The CIA imposed a stipulated monetary penalty for each day Acadia failed to implement or comply with requirements for "training and education of Covered Persons," the "Disclosure Program," or "reporting of Reportable Events." J.A. 145–46. The penalty was to automatically "*accrue on the day after the date the obligation became due.*" J.A. 145–46 (emphasis added). If, as Wheeler alleges, Acadia violated these provisions of the CIA, then the penalty for those violations accrued the day following each violation, thereby creating an obligation to pay a stipulated monetary penalty.

The only remaining step is for the government to collect on that penalty. This is the "contingency" that Acadia claims defeats its obligation. Yet there is nothing contingent about the obligations imposed by the CIA. Even though the CIA leaves to the discretion of the government whether to enforce the stipulated penalty provision, this is no different

from the decision by any contracting party to seek enforcement of a breach of contract. *See* Restatement (Second) of Contracts § 346 cmt. a (1981) ("Every breach of contract gives the injured party *a right* to damages against the party in breach." (emphasis added)). A contracting party's discretion to enforce an obligation does not eliminate the existence of that obligation.

Although our court has not previously confronted this issue, our conclusion is supported by decisions from several other circuits. *See United States ex rel. Bahrani v. Conagra, Inc.,* 465 F.3d 1189, 1204 (10th Cir. 2006) ("[G]overnment officials may have discretion as to whether to insist on a party's performance under a contract or whether to file a breach of contract action if a party does not perform. However, a contractual obligation falls within the scope" of a reverse false claim.); *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 741 (6th Cir. 1999) (concluding that the "definition of 'obligation' certainly includes those arising from [. . .] breaches of government contracts"); *United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 (11th Cir. 1999). That the government may exercise discretion regarding whether to charge the authorized fee does not render an obligation "contingent" in the context of a reverse false claim. *See Bahrani,* 465 F.3d at 1204.

Finally, to maintain a reverse FCA claim, Wheeler must allege facts sufficient to establish that Acadia knowingly concealed or knowingly and improperly avoided the stipulated penalty obligation. *See* 31 U.S.C. § 3729(a)(1)(G). As we explained, the CIA required Acadia to report to the HHS Office of the Inspector General any substantial overpayment or "matter that a reasonable person would consider a probable violation of

39

criminal, civil, or administrative laws applicable to any Federal health care program." J.A. 135. The report was to detail, "at a minimum, the types of claims, transactions or other conduct giving rise to the Reportable Event; the period during which the conduct occurred;" any federal laws or regulations probably violated; and any federal programs affected. J.A. 135–36. Wheeler alleges no such reports were made.

The purpose of penalizing "knowingly and improperly avoided" obligations is made plain in cases like this one. Though a government contract may provide for stipulated penalties, the government is unable to enforce that provision without notice of a breach. If the contracting party knows of a breach and fails to provide notice, the government might only learn of the breach and be able to recover damages if an FCA whistleblower—like Wheeler—comes forward to report it. That is particularly true where, as here, it is the *reporting requirement* of the government contract that has been violated. It is often said that whistleblowers are the eyes and the ears of the public. Without information from such whistleblowers, "fraudulent schemes might never be brought into the light of day, contrary to the intent of Congress in enacting the FCA." *Grant*, 912 F.3d at 205 (Keenan, J., concurring in part and dissenting in part).

We conclude by emphasizing that our holding with respect to Wheeler's reverse false claim is a narrow one. We hold only that the stipulated penalties in this contract, which have allegedly already accrued, constitute an obligation under the False Claims Act. We do not express any opinion as to whether a different liquidated damages remedy would constitute an obligation. That said, we conclude that Wheeler adequately pled her reverse false claim because the stipulated penalties in this particular CIA—if accrued—would

40

constitute an "obligation" under the FCA. Wheeler sufficiently alleges that the penalties accrued and were knowingly and improperly avoided.

## V. Conclusion

Wheeler adequately pled her claims of presentment, false statement, false certification, and fraudulent inducement, as well as her reverse false claim. Accordingly, we reverse the district court's dismissal of Counts I, II, IV, V, and VI of the amended complaint. We limit these claims, however, to actions allegedly taken by Acadia at its facilities in the State of North Carolina. We remand for further proceedings consistent with this opinion.

*REVERSED*